Hollis ORR, Plaintiff-Respondent,

v.

Everett Eugene WILLIAMS and L. E. Beckman, d/b/a Beckman Chevrolet Company, Centralia, Missouri, Defendants-Appellants.

No. 23933.

Kansas City Court of Appeals.

Missouri.

April 6, 1964.

Warren D. Welliver and J. Turner Jones, Welliver, Porter & Cleaveland, Columbia, for defendants-appellants.

Spencer, Hines & Petri, Columbia, for L. E. Beckman, defendant-appellant.

Scott O. Wright and H. C. Willbrand, Brown, Wright & Willbrand, Columbia, for plaintiff-respondent.

DEW, Special Commissioner.

The plaintiff sued to recover damages to his tractor and trailer caused when they were overturned upon contacting a steel cable stretched across the highway. The defendants had stretched the cable while engaged in pulling a stalled car from a ditch on the roadside. The jury rendered a verdict for the plaintiff in the sum of $8,735, and defendants have appealed.

The petition alleges that at all such times defendant Williams was the agent and employee of the defendant Beckman and acting in the scope of his employment; that plaintiff was on December 20, 1960, the owner of a 1956 International truck to which was attached a Keystone trailer owned by him and loaded with livestock; that plaintiff's driver was driving said equipment south on Highway 63 near Clark, Missouri, on the afternoon of that date, and was exercising the highest degree of care in such operation; that he followed a highway snow plow which was pushing snow from the highway, which vehicle stopped, partially on the west shoulder of the highway and partially on the roadway; that plaintiff's driver then pulled to the left around the standing snow plow and at that time saw a wrecker belonging to defendants sitting on the east shoulder of the highway headed south, and that as he approached to its immediate proximity he saw a steel cable stretched from the wrecker across the highway to a stalled car in a ditch on the other side of the highway.

The petition further alleged that upon seeing the cable stretched across the highway, plaintiff's driver attempted to stop and avoid hitting it but was unable to stop; that his tractor-trailer struck the cable and was caused to turn around and turn over, greatly damaging both units and killing some and injuring others of the livestock.

It is charged in the petition that defendants were negligent in stretching a cable across the highway when they knew, or in the exercise of ordinary care should have known, that persons lawfully using the highway would be unable to see such obstruction; that defendants negligently failed to give proper warning to such persons traveling the highway when they knew, or in the exercise of the highest degree of care should have known, that motor vehicles might come in contact with the cable; that they negligently failed to barricade the traveled portion of the highway to prevent vehicles from coming in contact

with said obstruction; that defendants failed to place any notice or warning of such obstruction; that defendants obstructed the highway in violation of Section 229.-150 RSMo 1959, V.A.M.S. The petition avers that as a result of such negligence plaintiff's tractor and trailer were torn and damaged; that he was required to expend additional funds to deliver the livestock to its destination; that he lost the use of said equipment from December 20, 1960 to February 14, 1961; that said damages and other losses amounted to a total of $9,000, for which judgment was prayed.

Defendants' answer denied the allegations of negligence on their part and pleaded contributory negligence of the plaintiff.

At the trial the plaintiff called as his first witness the defendant Williams. According to that witness he was in the employ of defendant Beckman on the day of the accident. Among other duties he operated Beckman's wrecking outfit. On the trip in question he could not say how many fuses he took along to use while removing the stalled car at the place of the accident, nor how many lamps or fire pots he had. He did not know if he had any red warning flags in his truck. He drove part of the way to the scene at about 30 or 35 miles per hour. He had used all of his flares in removing another car that same afternoon. He had difficulty in getting traction to pull the car at the place of plaintiff's accident. The stalled car was in a ditch on the shoulder of the west side of the roadway and he placed the wrecker on the east shoulder facing south with a cable attached to the boom and extending to and attached to the stalled car on the west shoulder. The lamp pots would not light and could not have been seen if lighted.

The witness testified that the boom on his wrecker was extended toward the north at a 45 degree angle and had a red light on it near the cab. He said he saw a snow plow stop north of the scene but did not ask the driver for any signals or warning devices, flares or flags, such as he had forgotten to bring along. He did not do any signaling of traffic. He was busy operating the winch on the wrecker and his helper was busy holding the wrecker from slipping. The northbound lane approaching the wrecker was open and a part of the southbound lane. The cable when stretched across the highway was five feet high at the wrecker and about one foot high at the west side of the roadway. The cable was about the size of "your little finger" and greasy with no flags or markers on it. At the time the cable was tightened across the highway the witness said he heard a truck horn blow. He was facing southwesterly, watching the stalled car across the highway and working the levers. When he heard the horn he "hit" the lever to release the cable, was unable to get it released and "I just ran". He saw the tractor turn, go across the ditch and turn over. He did not see the tractor hit the cable, but could see only a scratch on the cab. The tractor was lying on the east side of the highway and the trailer was across the ditch and over in the field. In it were hogs and cattle. The driver of the stalled car meanwhile remained in the car trying to guide it out of the ditch as it was being pulled.

Plaintiff's driver, Walter Adams, testified that he was driving plaintiff's 220 International 1957 gas truck and Diesel trailer involved in the accident. His testimony tended to show that he was hauling half a load of hogs and half a load of cattle from Salisbury to St. Louis, Missouri. The stock belonged to the farmers for whom plaintiff had hauled before. The highways were icy. On Highway 63 he reached a level strip of road going south and he traveled at 30, 35 or 40 miles per hour. He had seen snow plows at work on the highway that morning and was keeping a mile or a mile and a quarter behind one on Highway 63. As he approached the place where the accident later occurred he could see that the snow plow had stopped, half on the roadway and half on the west shoulder. This was about 200 feet north of where defendants' wrecker was later seen by him. He said that

when within about three quarters of a mile of the standing snow plow and while traveling about 30 or 35 miles per hour he saw a white object on the east side of the highway that looked to him like a "pick-up". When about half of a quarter of a mile distant he could see that it was a wrecker. He could not see any car on the west side of the highway because of the standing snow plow nearby. He saw no lights on the wrecker nor any flares or warning signals and saw nobody in sight.

Witness Adams further testified that under the above conditions and seeing no traffic approaching from the south, he sounded his horn, pulled out and around the snow plow and then saw the steel cable stretched across the highway. He applied his brakes, his hand control and foot brake. The trailer went off the roadway and turned over and the tractor hit the cable on the driver's side of the cab about five feet high and just below the headlight on the other side. The contact was so strong that it broke the bumper off the stalled car on the other side of the highway to which it was attached. The tractor was turned over on its left side, its frame was sprung on that side, and it was bent where the cable had hit it.

Witness Adams testified further that after the collision he got out of the tractor as best he could; that the hogs were lying all over each other; that he could not release the cattle because there were no fences in the area. Many of the hogs were dead. It was later found necessary to cut a hole in the top of the trailer to get the stock out. The cable was black and greasy. The day was clear, the sun was shining, and the highway covered with ice and snow.

On cross-examination witness Adams said that he could tell from a distance of one to three-fourths of a mile that the vehicle ahead of him on the left was a wrecker, that he saw the snow plow had three lights across the back and an amber light flashing on the top. He could not see any cable. He said he could stop his tractor

and trailer under the existing conditions in about 400 or 450 feet. He said he saw no red lights on the wrecker. He immediately applied his brakes when he saw the cable stretching across the roadway. He had lessened his speed when he first saw the white object which appeared to be a pickup truck, but otherwise kept his 55,000 pound rig moving, since he saw no one around and the way was clear around the standing snow plow.

The plaintiff testified that he was in the livestock business and operated a hog-buying market at Salisbury, Missouri; that he delivered hogs bought by him on a commission basis to destinations ordered by his boss; that the business is a seasonable one, and is at its best in November, December and January; that he hauled at least five truck loads a week with his tractor-trailer to places such as Muncie, Indiana, and St. Louis, Missouri; that he owns his own business, has four employees, does his own bookkeeping, banking and payment of expenses. He said he had five trucks at the time of the accident, some of them small, but none others that were capable of long trips; that he had made about five trips a week with the damaged tractor-trailer; that he had for years turned business away at times because his trucks were tied up.

Plaintiff testified that Walter Adams had worked for him about a year, driving trucks such as the one involved in the accident; that he had known him since he was old enough to drive a car; that he ordered Adams to take the load to St. Louis as described in the evidence; that its weight was about 28,000 pounds, half cattle and half hogs, the hogs double-decked in the front half of the trailer. He stated that he had just bought the trailer 17 days before the accident and that it was in good condition before that occurrence. He said that when notified of the wreck he and two other drivers went to the scene with two extra trucks, another trailer and a small pickup truck. There he saw the trailer and truck lying on their left sides on the east side of the road and the tractor blocking the north-

bound lane, the trailer being still attached to the tractor and reaching across the ditch and into a field. Two state troopers had arrived. A bigger wrecker had been called from Moberly.

Testifying further the plaintiff said that the rear doors of the trailer were all jammed and could not be opened; boards were broken and the stock all jammed together; that an opening had to be made in the roof of the trailer to get out the stock. Two of the other trucks were taken to the adjoining field, backed up to the trailer and a portable chute was set up over which such of the cattle as could walk were loaded into the other trucks. One dead animal was left in the trailer. Such of the hogs as were alive were loaded into another truck. The dead hogs were left in the trailer. The large wrecker then turned the trailer and truck back on their wheels. They were then pulled down the highway to Clark.

The plaintiff further stated that the truck was purchased for a special reason, namely, that it had a sleeper cab which provided sleeping accommodations for an extra driver for 24 hour running under I.C.C. regulations; that they are built on order; that after the wreck it was taken to Kansas City for repair. He said he could have kept it loaded every day if he had it on hand while being repaired. He had no other trucks that could make long distance hauls. He turned down business while the repairs were being made. He said from his experience in business and buying trucks of the kind involved, the reasonable market value of it immediately before the accident was $2,500. After the accident he found the frame, the back housing, one gas tank and the fifth wheel mounting all damaged, and the front of the cab creased completely across by the cable. In his opinion the reasonable market value of the tractor immediately after the accident was $800. He said the sides of the trailer were mashed in on one side and mashed out on the other; that the frame was in a hook; one of the rear axles was bent, the roof was crumpled

and buckled and a hole had to be cut in it to remove the stock. The nose of the trailer was shoved backwards; the floor itself was buckled and "busted"; the dolly support was bent sideways and the rear doors jammed. He said its reasonable market value immediately before the accident was $6,000 and immediately afterwards, $1725.

The plaintiff stated in his testimony that after the accident the tractor was towed to Kansas City to a framing company for repairs and the trailer was pulled there to the Keystone Trailer Company for repairs; that from his own personal knowledge the operation of the tractor-trailer grossed him about $685 per week; that such estimate was based on his personal knowledge of past business over several years prior to and since the accident; that the weekly operating cost was about $340; that his net profit from the operation of the outfit was $340 or $350 per week; that the outfit was out of operation for eight weeks from December 20 to February 14; that the time for repairs was reasonable because the body of the truck could not be repaired until the frame had been straightened, after which the unit had to be turned over to the body company for body work. The time taken for his outfit repairs was reasonable in his opinion. He said his total loss of use of the tractor was $2800 to $2850. He said he did not have the trailer repaired but did have an estimate of the cost of the same, $2648.55. He bought a new trailer, built to serve his purposes, within five weeks, but could not use it because he could not get his repaired tractor for eight weeks. He said there were possibly places to lease tractors, but that he did not try to lease one, but gave business away while his truck was tied up.

As witness for the defendant, the driver of the snow plow testified that he noticed from a mile's distance the red light on defendants' wrecker although he could not tell until he got closer which vehicle it was on; that he stopped when a motor grader ahead of him had gone on as the cable was

lowered for its driver; that he remained standing so that the grader could get more distance between them; that he signaled to the wreckers to proceed with their job of removing the stalled car from the ditch on the west side of the roadway. His snow plow was standing half on the roadway and half on the west shoulder and about 150 feet north of the wrecker and stalled car. He said he watched the wrecker working and he occasionally looked in his rear vision mirror to see if any traffic was approaching from the north. He said the cable was stretched across the highway and he could see it before he began to stop. He had been traveling 25 or 30 miles per hour, intending to let the grader make further distance ahead of him.

The driver of the snow plow further testified that he saw the man in the stalled car get out and run and he (witness) looked and saw plaintiff's tractor-trailer approaching from the north; that he stepped out of the snow plow and signaled a couple of times and he could hear the motor of the approaching tractor. He said he did not hear the driver shut down his motor but saw him pull toward the center of the road and he (witness) ran behind his snow plow. The driver of the tractor-trailer, he said, then shut off his motor and locked his wheels. The tractor began to swerve, went past the snow plow and the rear end of the trailer turned over on its left side, pulling the tractor towards the ditch where it, too, turned over. He stated that he could not tell whether the tractor turned over before it reached the cable or afterwards because his view of the wrecker was cut off by the plaintiff's tractor-trailer. The witness said that on his own vehicle standing 150 feet to the north, he had two tail lights seven feet above the ground; that the wreckers did not ask him to warn traffic or to supply any flares for that purpose. He saw no flares at the scene.

A traffic officer testified for defendants and described the position of the various vehicles present. He said the plaintiff's tractor and trailer were lying on their left sides on the east side of the highway. He said the road was packed with snow and ice for a considerable distance each way from the scene of the accident; that the driver of the tractor-trailer said to him: "I was coming down the road. I seen the vehicle setting there and there was nobody flagging. I honked and started through and then I seen the cable across the road". The witness said he saw a red flashing light on the wrecker. He said the weather was partly cloudy at the time.

■ The defendants first contend that the court erred in refusing to sustain their motion for a directed verdict submitted on the ground that plaintiff failed to make a submissible case of negligence. In considering this point we must view the evidence in the light most favorable to the plaintiff in whose favor the verdict was rendered and give him the benefit of all favorable inferences therefrom, disregarding such evidence of the defendants that does not aid the plaintiff. Hale v. Kansas City Southern Ry. Co., Mo., 363 S.W.2d 542; Erbes v. Union Electric Co., Mo., 353 S.W.2d 659. The defendants point out contradictions in the evidence as to whether or not certain warnings were given plaintiff's driver at the place of the accident, most of which the driver testified he did not see, but which defendants' witnesses said existed. Defendants assert that such warnings as their witnesses said existed were admittedly present since plaintiff's driver simply said he did not see them. We think the fact that he did not see them on a level highway in broad daylight is some evidence that they were not present.

■ Under the same point the defendants argue that because of such testimony as to warnings, the issue, therefore, was whether the defendants were merely blocking the highway in violation of the statutes establishing the Rules of the Road in Missouri. Chapter 304 RSMo 1959, V.A.M.S. Assuming that such was the only issue of negligence, they maintain that defendants'

outfit was a privately owned wrecker and therefore was an "emergency vehicle" exempted from the Rules of the Road set forth in such statutes and as such, while performing emergency service, could "park or stand irrespective of the provisions of Sections 304.014 to 304.026". As to such contention it must be borne in mind that in the first place, this case was not submitted on the theory of mere blocking of the highway, but on a claim of negligently stretching a steel cable across a public highway without adequate warning, resulting in plaintiff's damage. Secondly, while the wrecker in the instant case, being privately owned, may be classed as an "emergency vehicle" under Section 304.022, it is exempted under that section from the Rules of the Road as to parking or standing, but that section does not exempt such operators from liability for stretching a steel cable over and across a public highway without adequate warning thereof to travelers.

■ Defendants make the further point that the court erred in refusing their motion for a directed verdict because the plaintiff's agent was guilty of contributory negligence as a matter of law. Such action by the court is authorized in this state under circumstances in evidence which leave no room for any other reasonable inference than the plaintiff's contributory negligence. Pipes v. Mo. Pac. Ry. Co., Mo., 338 S.W.2d 30. The evidence in the present case, however, is such that we cannot declare as a matter of law that plaintiff's driver was negligent in such respect as to contribute to the cause of the accident. The issue was submitted to the jury on substantial evidence and determined in plaintiff's favor. We believe there is no sufficient evidence to disturb that finding. In our opinion the court did not err in refusing defendants' motion for a directed verdict.

■ Defendants urge that the plaintiff's Instruction No. 1 assumes but does not require the jury to find certain essential disputed facts, and that it is argumentative and ambiguous. They direct our attention to the part of the instruction reading: "and if you find and believe from the evidence that the defendant Everett Eugene Williams knew, or in the exercise of ordinary care should have known, that said cable stretched across the roadway was of such character as to be dangerous to travelers thereon and difficult for operators of motor vehicles to see and distinguish, if you so find, * * *". It is claimed that such language assumes the element of dangerousness and only requires the jury to find if the defendants had or should have had knowledge of such danger. This charge is without foundation because the jury is specifically required to find the element of dangerousness and the difficulty, if any, of seeing the obstruction, by the concluding words "if you so find". (Italics supplied). The point is overruled.

■ In the defendants' next contention that the plaintiff's Instruction No. 1 is argumentative, they refer to the language that Everett Eugene Williams "failed to place any adequate or proper notice, signal or warning to warn travelers on the highway of the presence of the obstruction * * *". It is claimed that there was evidence of a red light on the wrecker and an eight inch spotlight on the parked snow plow; that plaintiff's driver admitted that he first saw the truck and the wrecker when at a distance of three-quarters of a mile. It is likewise argued that because of such evidence the words "adequate notice" were indefinite and argumentative. There was evidence, however, that the red light was on a wrecker which was located not on the highway, but entirely off the traveled portion of the highway; that the wrecker appeared as a white pickup truck; that the red light was on the boom of the wrecker and near the cab; that the boom was set at a 45 degree angle and the red light was difficult to be seen from the plaintiff's tractor-trailer; that the light on the snow plow was on the same side of the highway as was the tractor-trailer. It was a proper question

for the jury to determine whether there was adequate or proper notice and warning, to operators of tractor-trailers on the highway, of a suspended steel cable across the roadway ahead to enable them to see and to avoid such obstruction. Likewise, the terms "adequate or proper" were sufficiently clear and fully informed the jury of the question to be determined.

■ Defendants further claim that it was error to admit in evidence plaintiff's testimony as to loss of profits by reason of being deprived of the use of his tractor-trailer during the period of repairs to the tractor since the same was irrelevant, incompetent and prejudicial, and that the court erred in refusing to grant defendants a remittitur on that account. It is charged that evidence of loss of use was inadmissible in the absence of proof that a rental unit was unavailable; that evidence of loss of the use of a single truck was not relevant, the proof necessary being the loss of profits to plaintiff's entire business; that such evidence called for mere conclusion of the jury. The plaintiff challenges these points of error not only on their merits, but first on the right of defendants to submit the same for review on this appeal for the reason that they were not properly preserved for review. Plaintiff cites and relies on Supreme Court Rule 83.13(a), V.A.M.R. requiring allegations of error in a civil case, in order to be preserved for review on appeal to be presented to or expressly decided by the trial court. See also Rule 79.03. It is urged by the plaintiff that no valid objection was made at the trial to the evidence pertaining to the plaintiff's loss of profits, nor was any such ground contained in defendants' motion for new trial.

We believe the objection to this line of testimony was preserved for review. The first mention of loss of use of the tractor-trailer occurred when plaintiff was asked by his counsel what "the outfit grossed you in dollars per week?" Objection was then made that such was not a proper element of damages, was speculative, and that there was "no showing that plaintiff tried to get another vehicle to replace the one damaged". This objection was overruled and certain further questions on the subject ensued as to which general or incomplete objections were made. Among the grounds assigned in defendants' motion for a new trial is an objection to the submission to the jury of an element of damages consisting of a loss of use of the vehicles; and that such damage was not recoverable because plaintiff's own evidence was that the outfit was destroyed.

The record does not disclose any request for a remittitur on account of any damages claimed for loss of use of the vehicles nor any evidence of a total destruction of the units of plaintiff's tractor-trailer.

■■ In respect to the measure of damages through negligence to personal property used in business there are two classifications of such property to be considered. One is property that has been entirely destroyed by the negligence complained of, in which class a recovery of the full value of the destroyed chattel excludes recovery for loss of use of same. The other class is composed of property that has not been destroyed, as in the instant case, but merely damaged, permitting recovery of the value of the loss of the use of such property for the reasonable period during which the owner is deprived of the damaged chattel for repairs. In such latter class the measure of damages is the extent of the injuries to the property, plus the value of its use during a proper period for repairs. It is stated in 25 C.J.S. Damages § 83, page 600: "Where through an injury to property plaintiff is temporarily deprived of its use, the measure of his damage is the amount of the injury to the property, together with the value of its use during the time required by the exercise of proper diligence to secure repair. On the other hand, one who recovers the full value of a chattel destroyed through the negligence of another ordinarily cannot recover for the value of the use thereof after it was destroyed".

The general rule fixing the proper measure of damages for injuries to one's personal property by others is well established, namely, the difference between the reasonable market value immediately before and immediately after the injury. Hall v. Clark, Mo., 298 S.W.2d 344; Wilson v. Motors Ins. Corp., Mo.App., 349 S.W.2d 250, 255.

The rule has its exceptions and may include other elements. See Brown v. Zorn, Mo.App., 275 S.W. 572, 574; Brunk v. Hamilton Shoe Co., 334 Mo. 517, 66 S.W.2d 903, 910; Hayes v. Dalton, Mo.App., 257 S.W.2d 198, 201; 25 C.J.S. Damages, § 83, pages 598, 599. Damages for loss of use of a damaged motor vehicle are now recoverable. Weller v. Hayes Truck Lines, 355 Mo. 695, 197 S.W.2d 657, 663.

Defendants cite, among other authorities, this court's opinion in Conley v. Kansas City Rys. Co., Mo.App., 259 S.W. 153, wherein it was ruled in a suit for damages to an automobile used in the livery business that the measure of damages for the use of the car while it was being repaired was the cost of hiring another similar car for such period; that in the absence of a showing in that case that a similar machine could not be hired in the market at that time, the plaintiff could not recover lost profits. It is true that in the case at bar the plaintiff, under cross-examination, said it took eight weeks to get his tractor repaired, that there possibily are places where tractors can be leased and that he did not try to lease one. However, we think that the plaintiff's evidence of the special features of the damaged tractor, adapted to 24-hour running schedules on long hauls of livestock, its specially equipped sleeping accommodations for the use and convenience of a dual operator system under I.C.C. regulations was substantial evidence of the unavailability of a similar machine for hire in plaintiff's locality. Under the record we believe it was not error for the court to submit to the jury the element of loss of use of the plaintiff's tractor-trailer during the period of repairs shown.

Referring to defendants' objection that evidence of loss of profits on a single truck is not relevant because the proper measure of damages for loss of profits is the loss to one's entire business, we note that the plaintiff sued for the loss of use of his tractor-trailer for the period of the repairs, alleged to have resulted in "his financial loss" and in his instructions asked to recover the reasonable value of the loss of his truck for a reasonable time. He testified of his own knowledge as to the weekly earnings of the tractor-trailer outfit over the period of several years' experience, the average weekly trips made, his estimate of the operating costs per week and the net profit lost while awaiting completion of repairs. We find no convincing authorities requiring a calculation of such financial loss to encompass all phases of one's business and all elements of one's other business assets. The point is overruled.

Respecting defendants' point that the plaintiff's testimony of loss of profits was incompetent because it was a mere conclusion, plaintiff contends that no objection to such testimony was made on that ground and is not reviewable on appeal. The record shows no objection made on such ground and it is, therefore, not reviewable. Rule 83.13(a) supra.

Lastly, defendants take the position that plaintiff's Instruction No. 2 on the measure of damages was erroneous for lack of any substantial or competent evidence under the best evidence rule from which the jury could reasonably find that plaintiff suffered any damage for the loss of the use of his tractor-trailer. That instruction told the jury that if it found for the plaintiff, in assessing the amount of his recovery it should take into consideration the difference between the reasonable market value of the tractor-trailer outfit mentioned in evidence immediately before the accident and its reasonable market value immediately after the accident, "and if you find that said tractor-trailer was used by plaintiff for business purposes, you may take into consid-

eration the reasonable value of loss of use of his truck, if any, for a reasonable period of time, as shown by the evidence in this case, necessary to repair the same". Cases are cited by defendants requiring some proof of "actual facts which present data for a rational estimate of profits". Spruce v. Mays, 333 Mo. 582, 62 S.W.2d 824; "Some evidence (in a claim for loss of profits in an action for breach of contract) from which a jury might find that plaintiff's estimate was approximately correct", Moss v. Mindlin's, Inc., Mo., 301 S.W.2d 761, 773; Tnemec Co. v. North Kansas City Development Co., Mo. 290 S.W.2d 169; Kopff v. Deves, Mo.App., 324 S.W.2d 768.

 We deem plaintiff's evidence as to loss of profits in the case at bar to be substantial. As to the objection that plaintiff's testimony on that point not being the best evidence, it must be borne in mind that his testimony was not offered to prove what his books would show, but what he knew of his own independent knowledge of the subject. This distinction is set out and the applicable rule is stated by this court in Central & Southern Truck Lines v. Westfall GMC Truck, Inc., Mo.App., 317 S.W.2d 841, 852. In that case objection was made on the ground of "not the best evidence" to a question to an owner of a damaged truck: "What is the earning record from your examination of that trailer per month, net, to the company?" The trial court overruled the objection and received the answer. This court said 317 S.W.2d at page 852: "In 32 C.J.S. Evidence, § 792d, page 721, in speaking of the parol evidence rule, it is said: '[t]he rule does not apply to exclude parol evidence given by witnesses where testimony is founded on their personal knowledge independent of the books; * * also books of account are best evidence only of what the books contain, and it has been held that a party may explain, contradict, or supplement an account as shown by books by competent evidence * * *'". Quoting further from Miller v. Great American Ins. Co., Mo.App., 61 S.W.2d 205, 207, the court said 317 S.W.2d at page 852: " 'But

plaintiff was not attempting to prove the contents of his books, records, invoices by oral evidence; rather he was attempting to prove the value of his stock of goods at the time of the fire. To the extent that his books, records, and invoices might have disclosed such value, he would have had two means of proof, one by his documentary evidence and the other by his parol evidence' ". The court in the case at bar accordingly ruled the answer of the witness to be competent since it was based on his own personal and independent knowledge of the subject matter. The ruling, in our opinion, was correct. Finding no errors materially affecting the judgment herein, the Special Commissioner recommends that the same be affirmed.

The foregoing opinion of DEW, Special Commissioner, is adopted as the opinion of the Court. All concur.