GATEWAY FOAM INSULATORS, INC., Respondent,

v.

JOKERST PAVING & CONTRACTING, INC., Appellant.

No. SC 89576.

Supreme Court of Missouri, En Banc.

March 31, 2009.

---

Bianca L. Eden, Jessica A. Mikale, Wegmann, Stewart, Dieffenbach, Tesreau, Sherman & Eden, P.C., Hillsboro, MO, for Appellant.

Mark A. Kragel, William W. Cheeseman, Law Office of William W. Cheeseman, Troy, MO, for Respondent.

MARY R. RUSSELL, Judge.

The question before this Court is whether a claimant whose specially-fitted commercial vehicle was rendered useless may recover both the replacement costs for the vehicle and the lost profits suffered from loss of use of the vehicle. The trial court correctly found that the claimant in this case was entitled to both replacement costs and lost-profits damages. The trial court incorrectly awarded the claimant damages for loan interest paid. The judgment is affirmed in part and reversed in part.[1]

## I. Background

This case arose after an employee of Jokerst Paving & Contracting, Inc. (Defendant) caused a traffic accident between Defendant's vehicle and a specialized foam insulation installation truck, known as a "foam rig," owned by Gateway Foam Insulators, Inc. (Plaintiff).

At the time of the accident, Plaintiff owned two foam rigs, which it used together on job sites to expedite completion of its work. The foam rigs included a generator, installation equipment, foam insulation chemicals, and other tools and equipment

---

1. This Court granted transfer after disposition by the court of appeals. Jurisdiction is vested in this Court pursuant to Missouri Constitution article V, section 10.

that might be needed at insulation installation jobsites. The accident destroyed the newer of Plaintiff's foam rigs, along with most of its tools and equipment on that rig. Plaintiff also was billed for the environmental cleanup of the hazardous chemicals that spilled from its rig at the time of the accident.[2]

Plaintiff investigated purchasing a replacement for the damaged foam rig, but it was unable to afford payments on a new vehicle.[3] Instead, Plaintiff borrowed money to purchase a used truck and to buy the necessary equipment to make that used truck into a foam rig. Plaintiff's owner testified that he could have worked full-time for two and a half weeks to make the replacement foam rig operational, but he stated that he did not have the money available to put the rig together in two and a half weeks.

Plaintiff sued Defendant seeking money damages for replacement of the foam rig, lost profits for loss of use, and payment for other costs associated with destruction of the foam rig. It argued that its position in the foam insulation installation market was negatively impacted after the accident with Defendant's vehicle.[4] It maintained the loss of the rig affected its ability to complete jobs timely, thereby diminishing its client base and allowing competitors to enter the market.

Plaintiff's owners and accountant testified at trial about lost profits suffered because of loss of use of the foam rig. The accountant testified that she had reviewed Plaintiff's business records and its construction market to determine estimated lost profits at a minimum of $120,000. She testified that $130,000 to $135,000 would be the maximum lost profits due to the loss of Plaintiff's foam rig.

Defendant complained at trial that Plaintiff's exhibits relating to lost profits were based on speculation. It suggested that Plaintiff could have avoided lost profits by more quickly replacing its foam rig, and it argued that Plaintiff overstated the value of its damaged rig and equipment. While Plaintiff's accountant agreed that a new truck would have prevented its lost profits, she also testified that Plaintiff lacked the financial resources to purchase a new truck at the time of the collision. The accountant explained that, at the time of the collision, Plaintiff's owners already were mortgaging rental property to keep the business running.

Defendant, however, presented contrary evidence about Plaintiff's lost profits. Its retained accountant testified that he had reviewed Plaintiff's tax returns to estimate daily revenues and calculated lost profits of approximately $450 per day until the rig was operational. He highlighted that lost profits could not be calculated "to a reasonable degree of certainty" because there were too many variables to consider. He indicated that "it would be hard to arrive at something that is real specific and two

---

2. For more than a year after the accident, Defendant stored the damaged foam rig at no cost to Plaintiff. The rig also was also stored for a time by a trucking company that eventually purchased the rig from Plaintiff, with the storage costs charged by that company being factored into the salvage purchase price it paid to Plaintiff.

3. A foam industry distributor testified on Plaintiff's behalf that a new foam rig could cost $85,000 to $90,000.

4. At the time of the accident, Plaintiff's older foam rig was unavailable for use because it was in the process of being disassembled so its parts could be used for building a new truck. The older rig was restored to service, but was unreliable. Plaintiff's owners testified that it was their business plan to operate two foam rigs on job sites.

people would agree that that is the exact number."

After hearing evidence from both parties, the trial court awarded Plaintiff lost profits based on its accountant's estimation of $120,000. The trial court found that Plaintiff's accountant "was credible" and that her estimations were "reasonable under the circumstances" as she was "intimately familiar with Plaintiff's business . . . and factors affecting the loss of business and profits as a direct result of" loss of the foam rig.

In addition to the lost profits, Plaintiff also was awarded $68,500 for replacement damages for its destroyed foam rig and equipment and tools.[5] In addition, Defendant was ordered to pay $11,723.83 for the interest on the loan Plaintiff was required to take out to replace the damaged rig and $12,746.72 for the cost of environmental cleanup associated with the collision.

Defendant appeals.

## II. Standard of Review

■■■ A judgment in a court-tried case will be affirmed if there is substantial evidence to support it, it is not against the weight of the evidence, and it does not erroneously declare or apply the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). Because the trial court, rather than this Court, weighs the evidence, this Court's review of the damages awarded is limited to a determination of whether the verdict reflects the substantial evidence presented. *See Collier v. City of Oak Grove*, 246 S.W.3d 923, 925 (Mo. banc 2008). "The evidence will be considered in the light most favorable to respondent,

giving him the benefit of all reasonable inferences and disregarding appellant's evidence except as it may support the verdict." *Emerick v. Mutual Benefit Life Ins. Co.*, 756 S.W.2d 513, 523 (Mo. banc 1988).

## III. Arguments

### A. Plaintiff was rightly awarded lost-profits damages

### 1. Lost profits were available to Plaintiff

■■■ "The goal of awarding damages is to compensate a party for a legally recognized loss . . . [and a] party should be fully compensated for its loss, but not recover a windfall." *Ameristar Jet Charter, Inc. v. Dodson Int'l Parts, Inc.*, 155 S.W.3d 50, 54 (Mo. banc 2005). Where a property owner is the victim of a tort that destroys his property, the law seeks to restore him for his "full actual loss" by awarding him the "monetary equivalent" of the destroyed property so as to place him in "as good a position as he would have enjoyed in the absence of the destruction." *Stark Bro's Nurseries & Orchards Co. v. Wayne Daniel Truck, Inc.*, 718 S.W.2d 204, 205–06 (Mo.App.1986). Typically, where destroyed property can be replaced, "the owner of the property is fully compensated upon receipt of the expenses of replacement." *Id.* at 206. But an owner is not fully compensated if he suffers lost profits where the replacement of his destroyed property is delayed. *See id.* In such cases, as in Plaintiff's case, lost profits may be necessary to accomplish fully compensating the claimant for his loss.[6]

---

5. The trial court found that the fair market value of the vehicle at the time of the collision was $75,000 but noted that Plaintiff received $2,500 salvage value for the truck and $4,000 value for its usable compressor and generator.

6. A growing number of states hold that loss of use damages are recoverable where there was a reasonable delay before the destroyed property was replaced. *See Recovery for Loss of Use of Motor Vehicle Damaged or Destroyed*, 18 A.L.R.3d 497, § 9 (1968 & Supp.2008)

■ Making available lost profits in circumstances where they are caused by delayed replacement of the destroyed property is consistent with the standard applied in cases where damaged property is repaired instead of replaced. Traditionally, a plaintiff whose property is damaged and can be repaired can recover either (1) the cost of renting a similar piece of property for the period of repairs or, (2) if a rental is not available, lost profits for that repair period. *Orr v. Williams*, 379 S.W.2d 181, 190 (Mo.App. 1964). In this case, as in *Orr*, the owner of the damaged property suffered lost profits because there was not a ready replacement for the unique property that was damaged. *See id.* at 190 (noting that Orr's loss of use damages were shown by "substantial evidence of the unavailability of a similar machine for hire in [his] locality").

Defendant maintains that Plaintiff was wrongly awarded lost profits for loss of use and damages for replacing its foam rig because, it contends, these damage awards are duplicative. It urges this Court to apply *Orr* for the proposition that lost profits are only available when damaged property is repaired, not replaced. The facts of this case, however, demonstrate that lost profits were awarded in conjunction with replacement damages without resulting in an award of a windfall of duplicative damages.

Contrary to Defendant's assertions, Plaintiff has not been awarded overlapping damages in this case. Plaintiff was unable to afford a ready-to-operate "turn-key" foam rig to replace its damaged rig. As such, it needed time to finance and build a replacement foam rig from a used truck. And because a foam rig suited to Plaintiff's business is not on the rental market, it was without its needed second foam rig during the time it was building its replacement rig. The loss of profits associated with the time period Plaintiff was without use of its foam rig is distinct from the monies required for it to replace its damaged rig. The replacement costs were awarded to restore Plaintiff's ability to operate its foam rig, and the lost profits were awarded to acknowledge that its business suffered during the time it was unable to operate its foam rig. Where, as in this case, a claimant provides evidence supporting awards for replacement damages and lost profits, this Court finds no prohibition against awarding lost profits simply because property replacement monies also are awarded.

The trial court did not err in determining that lost profits were an available remedy to fully and fairly compensate Plaintiff for the harm it suffered as a result of the collision with Defendant's vehicle.

## 2. Lost profits were not premised on mere speculation

■ Defendant also challenges the sufficiency of the evidence supporting an award of lost profits in this case. " 'In evaluating the sufficiency of evidence to sustain awards of damages for loss of business profits the appellate courts of this state have made stringent requirements, refusing to permit speculation as to probable or expected profits, and requiring a

---

(reflecting cases opining loss of use damages were available for a reasonable time before replacement). For an early example, *see Reynolds v. Bank of Am. Nat'l Trust & Sav. Ass'n*, 53 Cal.2d 49, 345 P.2d 926, 927–28 (1959) (noting support from other cases and the Restatement for awarding lost profits for loss of use of commercial property that is wrongly destroyed; explaining that the traditional limitations on allowing loss of use damages for a totally destroyed vehicle are rooted in the historical limitations in trover actions at common law).

substantial basis for such awards.'" *Ameristar*, 155 S.W.3d at 54 (quoting *Coonis v. Rogers*, 429 S.W.2d 709, 713–14 (Mo. 1968)).[7] *Ameristar* makes clear that lost-profits determinations are based on estimations of prospective or anticipated profits and cannot be expected to operate as an exact science. *See id.* at 54–55. Because lost profits are of a character that defies exact proof, the trial court had a greater degree of discretion to weigh the lost-profits award based on common experience demonstrating that a substantial pecuniary loss has occurred. *Id.* at 55. In *Wandersee v. BP Products North America, Inc.*, this Court highlighted:

> For an award of lost profits damages, a party must produce evidence that provides *an adequate basis for estimating the lost profits with reasonable certainty.* To create an adequate basis for an award of lost profits, a plaintiff must provide evidence of the income and expenses of the business for a reasonable time before the interruption caused by defendant's actions, with a consequent establishing of the net profits during the previous period. While an estimate of prospective or anticipated profits must rest upon more than mere speculation, uncertainty as to the amount of profits that would have been made does not prevent a recovery.

263 S.W.3d 623, 633 (Mo. banc 2008) (emphasis added) (internal citations and quotations omitted).

Defendant contends that Plaintiff presented mere speculation to support its claim for lost profits, but the record does not support this argument. Plaintiff's accountant presented lengthy testimony about her calculations for its lost profits. *Cf. Parshall v. Buetzer*, 195 S.W.3d 515, 522 (Mo.App.2006) (noting that a business owner's testimonial evidence is sufficient to provide a rational basis for estimating lost profits). She testified that she believed that Plaintiff's sales decreased after the collision because it was unable to use two foam rigs. She noted that its post-collision decline in business came at a time that the housing and construction industry was experiencing a boom. She testified: "[H]aving lost this rig caused them to lose one of the most profitable times of construction industry in this region, during this period." She stated that she had studied the construction industry growth by researching census information for regional housing permits and data on pay records for commercial jobs. She explained that her lost profit calculation factored in likely gross revenue, less various expenses, and considered negative factors impacting the construction industry, such as construction material shortages caused after Hurricane Katrina and fluctuations in interest rates. Her estimation of lost profits also considered the good will and reputation that Plaintiff would have enjoyed after increasing its advertising spending to about $150,000 before the collision. She testified that, because Plaintiff could not fulfill the demand for its insulation with only one foam rig, Plaintiff lost business that was generated by its pre-collision increased advertising spending. Considering these factors, Plaintiff's accountant calculated estimated lost profits at a minimum of $120,000, which is the calculation that the trial court adopted in its judgment.

---

**7.** In *Ameristar*, a plaintiff sought lost profits for loss of use of its leased airplane that was damaged but later repaired. 155 S.W.3d at 53. This Court reversed and remanded the trial court's damage award after finding that there was not sufficient evidence to support the lost profits awarded in that case. *Id.* at 57. Because *Ameristar* was not a lost profits versus replacement damages case, nothing in the case limited lost profits based on the fact that the damaged property at issue was capable of being repaired, rather than replaced.

Contrary to Plaintiff's accountant's testimony, Defendant's retained accountant testified that his review of Plaintiff's past tax returns indicated that its estimated lost profits would be between $450 and $1,000 per day until its foam rig was replaced. But he expressed disbelief that lost profits could be calculated with a reasonable degree of certainty, opining that lost profits are a matter of interpretation based on different variables.

It was the trial court's task to weigh the differing testimony offered by each party's accountant, and it deemed the testimony of Plaintiff's accountant reliable and found her testimony provided an adequate basis for estimating the lost profits with reasonable certainty. Considering the evidence in the light most favorable to the trial court's determination, there was an adequate basis for the trial court's adoption of Plaintiff's accountant's estimation of lost profits of $120,000. Plaintiff's evidence was not rendered merely speculative because Defendant's accounting expert disagreed with Plaintiff's accountant's calculation. Under the facts in this case, the trial court did not err in concluding that Plaintiff had presented substantial evidence to support its lost profits claim.

### 3. The trial court did not wrongly fail to consider mitigation

██ Defendant also complains that the trial court erred in awarding Plaintiff $120,000 for lost profits because it could have more quickly replaced its damaged foam rig. Defendant correctly argues that the availability of lost profits for Plaintiff's loss of use of its foam rig was limited by the principle that Plaintiff had a responsibility to act within a reasonable time period to reduce its damages. *See Stallman v. Hill,* 510 S.W.2d 796, 798–99 (Mo.App. 1974) (a case discussing the "reasonableness" requirements for loss of use payable where damaged property is repaired). The time period in which Plaintiff acted can be considered reasonable so long as Plaintiff "exercised reasonable diligence" or if the delay was "occasioned by [D]efendant." *See id.* at 798 (noting that there should be sufficient evidence showing the claimant exercised reasonable diligence to make repairs in order to reduce damages as much as possible before seeking reimbursement from the wrongdoer).

██ In this case, Defendant failed to properly plead or preserve its mitigation arguments regarding the reasonableness of the delay. The record reflects that Defendant waived its mitigation argument by failing to raise the issue of the reasonableness of the delay in its answer, as is required by Rule 55.08. *Riddell v. Bell,* 262 S.W.3d 301, 305 (Mo.App.2008) (noting that the failure to mitigate damages is an affirmative defense that, pursuant to Rule 55.08, must be set forth in the answer or it is waived). Because of Defendant's failure to properly raise this argument in its answer, Plaintiff requested at trial that Defendant be barred from raising the delay as an issue of mitigation of damages. Defendant then moved to amend its answer so it could address mitigation, but the trial court overruled its motion. Defendant raised no objection to the trial court's ruling denying it the opportunity to amend, nor did Defendant make any offer of proof as to its contentions that Plaintiff unreasonably failed to mitigate damages because of the delay in replacement. Though this issue was not properly preserved, the parties' arguments do not address plain error review of it. Instead, they debate the sufficiency of the evidence regarding whether Plaintiff replaced its foam rig in a reasonable time.

██ Treating Defendant's arguments as a review for the sufficiency of the evidence, the record reflects that Plaintiff's

owner and accountant testified that the delay in replacing the foam rig resulted from the company's difficulties in obtaining financing to buy or build a replacement foam rig. While the owner acknowledged that he could create a foam rig using a purchased used truck within two and a half weeks, he indicated that he was incapable of financing the necessary parts to build a replacement foam rig in that time frame. Defendant suggested at trial that Plaintiff's arguments for delay were unreasonable, but the trial court found otherwise, crediting Plaintiff's witnesses' testimony regarding the delay precipitated by its financing difficulties.[8] It was in the factfinder's discretion to accept the Plaintiff's witnesses' delay explanations over the Defendant's evidence. *See State v. Oates*, 12 S.W.3d 307, 313 (Mo. banc 2000) (noting that "the determination of matters of witness credibility are largely within the discretion of the trial court"). As such, there was sufficient evidence that it "exercised reasonable diligence" to replace its vehicle in a reasonable time.

### B. Plaintiff was improperly awarded damages for loan interest paid

■ Defendant further contends that the trial court wrongly awarded Plaintiff damages of $11,723.83 for the interest Plaintiff paid on the loan it took out to build a replacement foam rig. Defendant argues that the interest is encompassed in the replacement costs for the rig, such that Plaintiff would obtain a double recovery if awarded monies for the interest on its loan. Plaintiff's brief concedes that, under *Ameristar*, it would impermissibly collect a double recovery if it were awarded the loan interest in addition to both lost profits and replacement damages based on the reasonable value of its destroyed foam rig. Given that Plaintiff concedes this argument, this Court reverses the trial court's award of loan interest monies.[9]

### C. Plaintiff can collect the costs for environmental cleanup

■ Defendant also argues that Plaintiff is not entitled to collect damages covering the costs of environment cleanup following the collision because these are special damages that Plaintiff failed to plead and prove properly. Nothing in the record, however, reflects that Defendant objected to the evidence relating to Plaintiff's environmental cleanup costs on the basis that the costs were improperly pleaded. Because Defendant did not raise this issue before the trial court, it did not preserve the issue for this Court's review. *See State v. Johnson*, 207 S.W.3d 24, 43 (Mo. banc 2006) (noting that arguments on appeal are limited to those stated at trial; that a point is preserved for appellate review only if it is based on the same

---

8. Other courts have found reasonableness when a delay is premised on unavailability of financing. *See Recovery for Loss of Use of Motor Vehicle Damaged or Destroyed*, 18 A.L.R.3d 497, § 21 (1968 & Supp.2008) (noting that "[a]n owner's delay in regaining use of his damaged vehicle because of his financial inability to pay for repairs effected thereon has been held not to abbreviate the period for which he is entitled to damages for loss of use, on the theory that it is the defendant's conduct which created the necessity for repairs, rendering the defendant responsible for making payment therefor possible"); *cf. Badillo v. Hill*, 570 So.2d 1067, 1068 (Fla.App. 5 Dist.1990) (noting that "[l]oss of use damages have been allowed for a period of time much longer than the time span during which repairs could or should have been made, because the plaintiff tried to effect the repairs, but due to his financial circumstances, he was unable to do so"; but rejecting this "subjective" standard).

9. This conclusion renders unnecessary exploration of *Defendant's* arguments suggesting that Plaintiff cannot collect loan interest damages because it failed to properly plead for these damages.

theory presented at trial; and that unpreserved issues merit only plain error review, if any); *State ex rel. Selby v. Day*, 929 S.W.2d 286, 288 (Mo.App.1996) (noting that an appellant is held to the specific objections presented to the trial court, as the court cannot be found to have erred on an issue not presented to it to decide). And in this case, nothing supports a finding of plain error based on this unpreserved argument.

 Defendant further maintains that the trial court erred in awarding Plaintiff cleanup costs because it wrongly overruled Defendant's objection that an invoice Plaintiff offered as proof of cleanup charges was not an admissible business record. Defendant, however, can show no prejudice from admission of the invoice if it was cumulative to other evidence admitted without objection. *Swartz v. Gale Webb Transp. Co.*, 215 S.W.3d 127, 134 (Mo. banc 2007) (quoting *In re the Estate of Looney*, 975 S.W.2d 508, 514–15 (Mo. App.1998), for the proposition that "[a] party cannot be prejudiced by the admission of allegedly inadmissible evidence if the challenged evidence is merely cumulative to other evidence admitted without objection."). The objected-to invoice was cumulative to cleanup costs evidence admitted without objection, which included the court file for the default judgment entered against Plaintiff and in favor of the cleanup company. Because the default judgment records provided evidence showing the cleanup cost $12,746.72, there was substantial evidence on which the trial court awarded cleanup costs to Plaintiff.

### D. Replacement damages were correctly calculated

 Defendant argues finally that that trial court wrongly entered a $68,500 dam-

age award for the foam rig because there was not sufficient evidence presented to support this award. It complains that there was not enough evidence about diminution of the value of the rig or its equipment and supplies, nor was there proper evidence about its fair market value before and after the collision.

Both parties acknowledge that Plaintiff's property damages for its destroyed rig are measured by assessing the difference between the rig's fair market value before and after the collision. *Groves v. State Farm Mut. Auto. Ins. Co.*, 540 S.W.2d 39, 43 (Mo. banc 1976) (stating that the general measure of damages for injury to personal property is the difference between its reasonable market value before and after the damage). Plaintiff's evidence included the testimony of a foam rig expert who testified, without objection, that he estimated the value of Plaintiff's pre-collision foam rig at $75,000 to $80,000. Plaintiff's owners testified about the value of the equipment on the foam rig, which they valued at more than $76,000.[10] Plaintiff's owner also testified that the damaged rig was sold for a salvage value of $2,500, after $4,000 worth of equipment and parts were recovered from the damaged rig. Defendant provided no independent evidence regarding the replacement value of the destroyed rig or equipment. Its cross-examination of Plaintiff's owner, however, highlighted that the owner had stated in his deposition that a used truck could be constructed into a foam rig for $55,000 to $65,000, not including the costs for necessary hoses and electrical adaptations.

It was the trial court's task to assess the credibility of the witnesses' testimony

---

10. A property owner may testify about his personal property's reasonable market value.

*See Collier*, 246 S.W.3d at 926.

about the pre-collision value of the damaged foam rig and the rig's diminution in value after the collision. When the record is viewed in the light most favorable to the judgment, this Court finds no basis for Defendant's contention that the trial court erred in awarding Plaintiff $68,500 for property damages.

## IV. Conclusion

For the foregoing reasons, the trial court's judgment is reversed only as to the $11,723.83 awarded for loan interest. In all other respects, the trial court's judgment is affirmed.

TEITELMAN, WOLFF, BRECKENRIDGE and FISCHER, JJ., concur; STITH, C.J., concurs in part and dissents in part in separate opinion filed; PRICE, J., concurs in opinion of STITH, C.J.

LAURA DENVIR STITH, Chief Justice, concurring in part and dissenting in part.

I concur in so much of the principal opinion as holds that damages may be recovered for loss of use of the truck while it was being replaced, for the reasonable period that it would take to replace the truck. I disagree that Gateway waited only a reasonable period of time to replace the truck, and I disagree that it proved its lost profits with reasonable certainty, and, so, I dissent from those portions of the opinion that affirm the award of lost profits.

Gateway presented evidence that its foam truck was unusual and required a specialized replacement truck. Replacement of such an unusual truck reasonably might be expected to take extra time and to support an award of lost profits for the reasonable period necessary to replace this unusual item.

Gateway's evidence was not actually based on evidence that it was so difficult to replace the truck that it could not do so for two years, however. To the contrary, it simply said it did not have the money to replace the truck. This seems surprising in light of Gateway's claim through its accountant that it was making hundreds of thousands of dollars per year in profits right up to the time that its truck was in the accident with Jokerst. But, had Gateway presented evidence that it needed the other profits to keep the business as a going concern and that it sought loans to purchase a second truck but it was refused, the award of lost profits for the period it took to save the money to modify a truck to Gateway's purposes might have been supported.

But Gateway did not offer such proof. Rather, the evidence showed that Gateway simply chose not to use its profits from its foam insulation business to replace the damaged truck or to secure a loan for a new truck. Stating that he could not afford the payments on a new ready-to-go truck, the owner said he borrowed a small amount to purchase a used truck and then spent two years fixing it up. Gateway offered no evidence of what the costs of a sufficient loan would have been or any evidence that it made any further attempts to secure a loan. Instead, Gateway used its assets to build up other aspects of its business, including hiring two new employees. After two years, it finally finished building its second truck. It then sought to recover the full amount of profits it believed it would have earned had it used the truck for the prior two years.

This was unreasonable. To justify such a lengthy period of delay in replacing the truck, Gateway should be required to present specific evidence as to why its profits from its existing business could not have been put into building or purchasing the

second truck and why a loan was not forthcoming. As this Court recently noted, "The goal of awarding damages is to compensate a party for a legally recognized loss ... [and a] party should be fully compensated for its loss, but not recover a windfall." *Ameristar Jet Charter, Inc. v. Dodson Int'l Parts, Inc.*, 155 S.W.3d 50, 54 (Mo. banc 2005). Unless proof of a reasonable inability to replace the truck for the full two-year period is shown, Gateway effectively is being rewarded by receiving the full profit it would have earned had it been doing work with the truck, with none of the risk and trouble of actually doing that work, for what is apparently an indefinite period, as the Court's opinion does not seem to set an outside time limit on the length of time for which lost profits can be obtained. Perhaps this is why prior cases have not permitted the recovery of loss of use damages in addition to replacement value: It is susceptible to abuse.

To avoid that danger, it would be appropriate to shift the burden of proof to the party seeking loss of use damages in cases of replacement rather than repair and require that party to show that it could not have further mitigated its damages further during the period for which it seeks loss of use damages. Because loss of use is a new item of damage in a case such as this, I would remand to give Gateway the opportunity to fill in the gaps in its evidence in this regard.

The record also does not support the award of $120,000 in lost profits, even were Gateway entitled to lost profits for the entire two-year period at issue. Gateway presented some evidence of its earnings over the years prior to accident. During most of that period, however, it had only one working truck because one of the trucks was often out for maintenance. To show lost profits, it needed to present evidence of specific business it had to turn away because of the lack of a second truck or at least show a downturn in business it could attribute to servicing fewer customers. This is in keeping with the standard of proof, noted by the principal opinion:

> For an award of lost profits damages, a party must produce evidence that provides *an adequate basis for estimating the lost profits with reasonable certainty. To create an adequate basis for an award of lost profits, a plaintiff must provide evidence of the income and expenses of the business for a reasonable time before the interruption caused by defendant's actions, with a consequent establishing of the net profits during the previous period.* While an estimate of prospective or anticipated profits must rest upon more than mere speculation, uncertainty as to the amount of profits that would have been made does not prevent a recovery.

*Wandersee v. BP Products North America, Inc.*, 263 S.W.3d 623, 633 (Mo. banc 2008) (emphasis added) (internal citations and quotations omitted).

In this case, evidence of lost profits was not provided by the business owner, but by the business' accountant. The holding in *Parshall v. Buetzer*, 195 S.W.3d 515, 522 (Mo.App.2006), and similar cases that a business owner can provide testimony as to the business' value, therefore, is inapplicable. Gateway's accountant did not purport to base her testimony on any evidence as to specific lost business, or as to a trend over a reasonable prior period showing profits that then she forecast would continue in light of real world conditions, or anything approaching a traditional method of proving lost profits. Instead, she testified as to the percentage of profits in the construction industry as a whole over the next two years. It had 18–percent profits, she said, so it was reasonable to assume that Gateway also would have had such

profits. She did not show that Gateway's profits previously had tracked the profits of the construction industry, however, or that *other foam insulators' profits matched* those of the construction industry generally, or show how Gateway's profits in the past had compared to those of other insulators.

If the accountant's testimony is sufficient, then in any case alleging lost profits, the plaintiff would be entitled to the industry average of profits, less variable expenses. Respectfully, that is not reasonable proof of lost profits. Rather, it is the definition of speculation.

For these reasons, I dissent from the award of lost profits and the amount thereof.