### Carmelita F. BROWN, Plaintiff-Respondent-Appellant,

v.

### NEW PLAZA PONTIAC CO., et al., Defendants-Appellants-Respondents.

#### Nos. WD 37498, 37499.

Missouri Court of Appeals, Western District.

Sept. 30, 1986.

Motion for Rehearing and for Transfer to Supreme Court Denied Nov. 4, 1986.

William C. Partin, Kansas City, for defendants-appellants-respondents.

John I. Moran, Kansas City, for plaintiff-respondent-appellant.

Before LOWENSTEIN, P.J., and MANFORD and GAITAN, JJ.

GAITAN, Judge.

This appeal and cross appeal arise from an action for fraudulent misrepresentation in the sale of an automobile. Judgment was entered against defendant, New Plaza Pontiac Company, ("NPP") for both actual and punitive damages. NPP appeals alleging as error the trial court's failure to grant a judgment n.o.v. on the issue of punitive damages. The plaintiff, Carmelita Brown, cross-appeals alleging the trial court erred by (1) allowing the defendant to present evidence of a settlement offer it made to plaintiff; (2) excluding evidence of a judgment against the defendant in a similar case as proof of malice; and (3) excluding evidence of the defendant's most recent tax return to prove its ability to pay punitive damages. The judgment of the trial court is affirmed.

## STATEMENT OF FACTS

This dispute arises from plaintiff's purchase of a used 1980 Datsun 200SX from NPP. Since the mechanical condition of this automobile was a major issue throughout the trial, its history will be reviewed in detail.

Prior to April 1983, this automobile was owned by Charles Morgan. While Mr. Morgan owned the automobile, it was involved in two accidents. The first accident occurred on November 12, 1982, resulting in a repair bill of approximately $4,438.00. The second accident occurred on January 13, 1983, resulting in repair bills of $3963.00.

NPP received the automobile as a trade-in on April 14, 1983. NPP's used car man-

ager, Marion Battaglia, had responsibility for evaluating all trade-ins. Mr. Battaglia testified that his normal procedure in evaluating a trade-in was to make a visual inspection of the automobile, and then to take a test drive.

Within two weeks after it took the Datsun as a trade-in, NPP performed two inspections which should have revealed the damaged state of the car. The first inspection was the Missouri Motor Vehicle Inspection, and the second was a checklist inspection to determine the work necessary to make the car saleable. A NPP Service Department work sheet shows that the inspections were completed by April 27, 1983.

The Motor Vehicle Inspection required a substantial amount of work under the car, including, inter alia, examining the steering, the suspension and the brakes. Although NPP indicated that the Datsun passed the Missouri Motor Vehicle Inspection, Ms. Brown was not provided with a copy of the Inspection Certificate. Coincidentally, when Ms. Brown applied for her tags, Ceslie Henry, the NPP salesman, happened to be at the Motor Vehicle Department. Mr. Henry persuaded the Department employee to issue the tags without receiving an Inspection Certificate.

Like the Motor Vehicle Inspection, the checklist inspection required a substantial amount of work under the car, including examining the suspension, engine block and transmission. Again, no checklist for the Datsun was ever produced.

In conjunction with these two inspections, the worksheet shows that NPP changed the oil and the oil filter on the Datsun's engine and performed a lubrication job on the Datsun's suspension on or about April 27, 1983.

NPP's policy is to accept every proffered trade-in car, whatever its condition, even if it has been wrecked. NPP thereafter decides whether to sell the car to another dealer in the wholesale market, or in the retail market. If the car is to be sold in the retail market, NPP tries to make the car look as new as possible by cleaning the car, and performing cosmetic repairs and detailing work. The decision to sell this Datsun in the retail market appears to have been made in mid-May, 1983.

One day in late June, Ms. Brown saw the Datsun on NPP's lot and it looked very attractive to her. She stopped, and went onto the lot to look at the car. Ultimately, Ms. Brown talked with NPP salesperson, Ceslie Henry. Henry suggested that Ms. Brown drive the car and they agreed to drive to Ms. Brown's home.

On the way the engine ran or idled roughly, and the left turn signal light and the speedometer did not work. When they reached the house, Ms. Brown's mother and a friend of her mother's, Tom Richardson, came out to look at the car. In response to a remark by Richardson, Ceslie Henry stated, in Ms. Brown's presence, that the Datsun was a good car and was in good condition. Henry repeated that statement, again in Ms. Brown's presence, a short time later, after he and Richardson drove the car around the block. Henry added that everything major under the hood was in order and in good condition. Thereafter, Ms. Brown and Henry drove back to NPP.

On the drive back Ms. Brown told Henry that she liked the car and was thinking about buying it, but because she knew nothing about cars she had to rely on Henry to tell her whether it was a good car. Henry assured her again that the car was in good condition.

On the following Tuesday, Ms. Brown returned to NPP. Henry again assured her that the Datsun was a fine car. He explained that the idling problem could easily be fixed with a tune-up and that the signal light and gauge would be repaired. Henry said that NPP would do this work at no cost to Ms. Brown, and she would have a good car with no worries. After a brief conversation about price, Ms. Brown agreed to buy the Datsun for $5,450.

Immediately after taking possession, Ms. Brown began to have trouble with the Datsun. On the day she picked it up it died a number of times. Though she returned the

car to NPP numerous times, the problem never was cured.

Other problems with the horn, the signal lights, and squeaking sounds from the brakes appeared. In August, problems with the steering became noticeable. At that point, Ms. Brown decided to take the car to Raytown Datsun. After the mechanics at Raytown Datsun inspected the Datsun, they gave Ms. Brown a service ticket dictated by Don Norfleet which set out the extensive damage described later by Norfleet at trial. The damage to the car lay in three main areas: (1) the steering, (2) the front brakes, and (3) the unibody.

### 1. Steering

There were two problems in the steering. First, the two main frame rails were drastically out of alignment with one another, having been bent by the wrecks. Likewise, the front wheels were out of alignment with one another. The right front wheel was pushed back so that it was a number of inches behind the left front wheel. Because of the nature and extent of the damage, Norfleet was simply unable to effect repairs that would return proper alignment. The misalignment so adversely affected the steering that it prevented the car from being roadworthy.

The second, and even more dangerous problem was that a portion of the steering arm was rubbing against the frame crossmember. The rubbing was such that if the car hit a pothole the steering arm could become stuck, locking the front wheels in a straight-ahead position, and making it impossible to steer the car.

### 2. Front Brakes

As a result of the wrecks, one of the brake fluid lines to the front brakes was pinched off by a portion of the front suspension. The friction on the brake line could break the line in two or impair or stop the flow of brake fluid.

According to Norfleet, the brake problem, like the steering arm problem should have absolutely precluded the car from passing the Missouri Motor Vehicle Inspection.

### 3. Unibody Frame

Two problems also existed with the unibody frame (i.e., the combined frame and body panels), each of which substantially lessened the integrity of the unibody and put persons inside the car at serious risk in the event of a collision.

The first problem was that the two main frame members of the unibody had been bent so far out of shape, that realignment was not possible. This distortion of the frame members put substantial stress on the entire unibody when the car was in operation. Each bump, hole or other irregularity pulled the frame members further out of alignment and caused the entire unibody to be pulled and flexed.

The stress on the integrity of the unibody was compounded by the second problem. The wrecks had broken apart the frame crossmembers and various body panels in the portion of the unibody which enclosed the passenger compartment. The repairs in these areas were grossly inadequate.

Both Sawyer and Norfleet agreed that the damage they found could not possibly have been caused by normal wear and tear, but had to have been caused by wrecks. Both agreed that the damage was readily apparent to a mechanic working under the car. Norfleet, who is a qualified Missouri Motor Vehicle inspector, added that the damage would have been readily observable to a mechanic performing such an inspection and would have prevented the car from passing. Finally, both men agreed that the car was unsafe. Sawyer valued the car at scrap—approximately $800–$850.

After learning of the damaged state of the Datsun, Ms. Brown confronted Chris Esposito, owner of NPP, with the Raytown Datsun repair ticket and requested a refund. Esposito refused, but offered to give Ms. Brown an identical car, or one of comparable value. Ms. Brown refused Esposito's offer, stating she did not want to

deal any further with NPP. Ms. Brown then brought this action against Ceslie Henry and NPP.

On May 22, 1985, the jury returned its verdict in favor of Ms. Brown and against defendants Ceslie Henry and NPP for actual damages in the sum of $4,600.00. In addition, the jury returned a verdict for punitive damages of $15,300.00 against defendant NPP, only. Plaintiff and defendants subsequently filed timely motions for new trial, all of which were overruled by the court on August 21, 1985. Thereafter, plaintiff and NPP filed timely notices of appeal to this Court. Defendant, Ceslie Henry, did not file a notice of appeal.

NPP contends that the trial court erred in submitting the punitive damage claim to the jury because after *Sanders v. Daniel Int'l Corp*, 682 S.W.2d 803 (Mo. banc 1984), ill will, spite, or grudge, i.e., actual malice, must be proved to support punitive damages. NPP argues that because Henry's conduct was imputed to NPP under plaintiff's *actual damage claim*, it is only Henry's conduct which is to be considered under plaintiff's *punitive damage claim*. Accordingly, since Henry was not guilty of actual malice, NPP cannot be held to punitive damages. In addition, NPP claims that Instruction No. 8 incorrectly defined "malicious".

■ NPP's arguments are without merit. The requisite standard of malice is not actual malice. Further, it appears that the actual malice standard of *Sanders v. Daniels* has been limited to malicious prosecution actions arising from criminal proceedings. *See Proctor v. Stevens Employment Services, Inc.* 712 S.W.2d 684 (Mo. banc 1986).

In *Proctor*, the Missouri Supreme Court considered the degree of malice necessary to establish liability in a malicious prosecution action arising out of a civil proceeding, and the degree of malice necessary to recover punitive damages in such an action. The court began by discussing the three degrees of malice as set out in *Sanders:* (1) actual malice which requires "ill will, spite, personal hatred, or vindictive mo-

tives"; (2) legal malice which requires an improper motive; and (3) malice in law wherein malice is inferred from intentionally doing a wrongful act without just cause or excuse. *Proctor,* at 686, *citing, Sanders,* 682 S.W.2d at 807–08.

The *Proctor* court determined that due to public policy considerations present in a malicious civil prosecution action, malice in law satisfies the element of malice required to prove liability. The court then turned to the malice required to recover punitive damages in such an action and decided that legal malice is necessary. *Proctor,* at 686–87. In so, determining, the court indicated that the standard of malice in cases other than malicious prosecution is generally legal malice. *Proctor* at 687, *citing, Pollock v. Brown,* 569 S.W.2d 724, 733 (Mo. banc 1978). Although this dicta in *Proctor* indicates that legal malice is the standard, the cases ambiguously refer to "legal malice" as the "intentional doing of a wrongful act without just cause or excuse", i.e., the definition of malice in law. *See e.g., Pollock v. Brown,* 569 S.W.2d 724, 733 (Mo. banc 1978); *Ackmann v. Keeney-Toelle Real Estate,* 401 S.W.2d 483, 489 (Mo. banc 1966); *Parker v. Green,* 340 S.W.2d 435, 441 (Mo.App.1960); *Walters v. Larson,* 270 S.W.2d 112, 116 (Mo.App.1954).

The cases cited by defendant in support of its argument that the *Sanders* requirement of actual malice has been extended beyond malicious prosecution cases, clearly applied the malice in law standard, not the actual malice standard. In each case, the court's opinion makes clear that the standard of malice applied was malice in law. *See Routh v. Burlington Northern Railroad,* 708 S.W.2d 211, 217 (Mo.App.1986) ("there is no evidence that Baning acted wrongfully with knowledge that he was taking Routh's property without just cause or excuse"); *Gaffney v. Community Fed. Sav. & Loan,* 706 S.W.2d 530, 535 (Mo.App. 1986) ("malice is the basis for awarding punitive damages and is to be determined by applying the test of whether the defendant did a wrongful act intentionally without just cause or excuse"); *Moon v. Tower*

*Grove Bank and Trust Co.,* 691 S.W.2d 399, 401 (Mo.App.1985) (although the court stated it was applying the legal malice standard, the court defined legal malice as the "[i]ntentional doing of a wrongful act without just cause or excuse in reckless disregard of the rights of others.")

Instruction No. 8 invoked the legal malice standard by defining "malicious" as "intentionally acting with an improper or wrongful motive, or consciously acting with wanton disregard for the rights of others." Therefore, if legal malice is the correct standard, then Instruction No. 8 was proper. If malice in law is the correct standard, then NPP was not prejudiced by instruction No. 8. Legal malice is the more difficult standard to prove since it "requires proof of a defendant's mental state whereas malice in law rests upon a legal presumption independent of any proof concerning a defendant's mental state." *Proctor,* at 687.

■ Second, it is not Henry's conduct alone which should be considered in determining whether NPP is guilty of malice. Henry is an agent of NPP and therefore, the conduct of all the officers and employees of NPP, such as Marion Battaglia is imputed to NPP. This includes the personnel in the Used Car and Service Departments, who must have discovered the wreck-damage and concealed it, which should be considered. That conduct clearly constituted legal malice as defined in Instruction No. 8, and therefore, malice in law as well.

■ The rule established in *State ex rel. Hall v. Cook,* 400 S.W.2d 39 (Mo. banc 1966), provides that even though liability for actual damages is joint and several and is accomplished by imputation of the conduct of one defendant to another defendant, separate punitive damages claims (i.e., one against each defendant) may be submitted if the evidence so warrants. Therefore, under *Hall,* submission of separate punitive damage claims, allowing the jury to consider the different degrees of culpability of Henry and NPP was proper. *See also Moore v. Shelton,* 694 S.W.2d 500, 501

(Mo.App.1985); *Fordyce v. Montgomery,* 424 S.W.2d 746, 750–51 (Mo.App.1968).

Accordingly, while the principles of joint and several liability and imputation of conduct may apply to an actual damages claim, such principles are not to be applied to a punitive damages claim when the evidence shows differing degrees of culpability and/or ability to pay. As the Missouri Court of Appeals, Southern District, stated in *Fordyce v. Montgomery,* 424 S.W.2d 746, 750–51 (Mo.App.1968), wherein an assault committed by one defendant was imputed to a second defendant:

> It would be highly artificial and unrealistic, however, to resolve the merits of this appeal simply by saying that the malice of one codefendant must be imputed to the other. Our Supreme Court has recognized that the joint and several liability of joint tort-feasors does not necessarily extend to liability for punitive damages in a case of this kind; there may be differing degrees of culpability among the codefendants and a jury may properly assess punitive damages against them in differing amounts.

Here, the *Hall* rule was properly applied because of the obviously differing degrees of culpability of NPP and Henry.

■ Having disposed of the issues on defendant's appeal, we now turn our attention to the cross appeal of plaintiff. As noted, plaintiff received a verdict and judgment against NPP for punitive damages in the amount of $15,300. She filed a motion for new trial on the issue of punitive damages only, which motion was overruled by the trial court. That motion for new trial did not contend that the jury award *was inadequate* or that it was inadequate *because* of any of the three points of error raised on her cross appeal: (1) error in allowing NPP to present evidence of its settlement offer; (2) excluding evidence of a judgment against NPP in a similar case as proof of malice; and (3) excluding evidence of NPP's most recent tax return. Thus, no claim was presented to the trial court that the verdict for punitive damages

was inadequate, which could be the only basis for awarding plaintiff a new trial on that issue.

■ On plaintiff's cross appeal, she likewise makes no claim in any point advanced that the punitive damage award was inadequate by reason of the admission and exclusion of evidence. Rule 84.04(d) provides, "The points relied on shall state briefly and concisely what actions or rulings of the court are sought to be reviewed and wherein and why they are claimed to be erroneous, * * *." No point here posits even that the trial court erred in overruling plaintiff's motion for new trial. All that is here stated in three points presented are abstract statements as to the admission and exclusion of evidence, with no reference as to how they affected any ruling of the trial court, or why and wherein any such ruling was error. Abstract statements present nothing for review. *Tudor v. Tudor*, 617 S.W.2d 610 (Mo.App.1981); *Galeener v. Black*, 606 S.W.2d 245 (Mo. App.1980). Only the issues properly presented in the points relied upon may be considered on appeal. *Smith v. Welch*, 611 S.W.2d 398 (Mo.App.1981); *Del Monte Corp. v. Stark & Son Wholesale, Inc.*, 474 S.W.2d 854 (Mo.App.1971). The argument portion of the brief does not flesh out any deficiencies in the points presented. All that is requested is a new trial on the issue of punitive damages, without stating any reason why plaintiff is entitled thereto. Plaintiff's cross-appeal is denied.

The judgment is affirmed.