# United States Court of Appeals
## For the Eighth Circuit

_____

No. 20-3663

_____

John S. Hahn, Special Master

Bader Farms, Inc.

*Plaintiff - Appellee*

Bill Bader

*Plaintiff*

v.

Monsanto Company

*Defendant*

BASF Corporation

*Defendant - Appellant*

------------------------------

American Seed Trade Association, Incorporated; Chamber of Commerce of the United States of America; Coalition for Litigation Justice, Inc.; CropLife America; DRI-The Voice of the Defense Bar; Missouri Agribusiness Association; Missouri Chamber of Commerce and Industry; National Association of Manufacturers; Product Liability Advisory Council, Incorporated; Washington Legal Foundation

*Amici on Behalf of Appellant(s)*

Missouri Association of Trial Attorneys; National Family Farm Coalition; Center for Biological Diversity; Pesticide Action Network; Center for Food Safety; Save Our Crops Coalition

*Amici on Behalf of Appellee(s)*

_____

No. 20-3665

_____

John S. Hahn, Special Master

Bader Farms, Inc.

*Plaintiff - Appellee*

Bill Bader

*Plaintiff*

v.

Monsanto Company

*Defendant - Appellant*

BASF Corporation

*Defendant*

------------------------------

American Seed Trade Association, Incorporated; Chamber of Commerce of the United States of America; Coalition for Litigation Justice, Inc.; CropLife America; DRI-The Voice of the Defense Bar; Missouri Agribusiness Association; Missouri Chamber of Commerce and Industry; National Association of Manufacturers; Product Liability Advisory Council, Incorporated; Washington Legal Foundation

*Amici on Behalf of Appellant(s)*

Missouri Association of Trial Attorneys; National Family Farm Coalition; Center for Biological Diversity; Pesticide Action Network; Center for Food Safety; Save Our Crops Coalition

*Amici on Behalf of Appellee(s)*
_____

Appeal from United States District Court
for the Eastern District of Missouri - Cape Girardeau
_____

Submitted: February 16, 2022
Filed: July 7, 2022
_____

Before SMITH, Chief Judge, BENTON and KELLY, Circuit Judges.
_____

BENTON, Circuit Judge.

Dicamba, an herbicide, kills broadleaf weeds that have grown resistant to other herbicides. Unfortunately, traditional dicamba herbicides harm crops. Traditional dicamba herbicides are also "volatile," meaning that they tend to vaporize and move off target. It was thus impractical—and unlawful—to spray dicamba herbicides over crops during growing season. *See* **7 U.S.C. § 136j(a)(2)(G)** (prohibiting "any person . . . to use any registered pesticide in a manner inconsistent with its labeling").

Monsanto Company and BASF Corporation began developing dicamba-tolerant seed in the early 2000s. They sued each other over intellectual property. By the settlement agreement, BASF relinquished rights to its dicamba-tolerant seed technology in return for "value share payments" for each acre with dicamba-tolerant seed sold by Monsanto. Both companies began to develop lower-volatility dicamba herbicides.

In 2015, Monsanto obtained USDA deregulation of its dicamba-tolerant cotton seed (Xtend). However, the EPA had not yet approved any lower-volatility dicamba herbicide. Despite warnings from its own employees, academics, and others against selling a dicamba-tolerant seed without a lower-volatility dicamba herbicide, Monsanto began selling the Xtend cotton seed. It tried to cut the risk of dicamba misuse with a "communication plan," including letters to farmers warning against "over the top" dicamba use, and discounts to offset farmers' inability to benefit from the dicamba-tolerant trait. Monsanto also placed a pink label on each bag of seed: "NOTICE: DO NOT APPLY DICAMBA HERBICIDE IN-CROP TO BOLLGARD II® 7 XTENDFLEX™ COTTON IN 2015. IT IS A VIOLATION OF FEDERAL AND STATE LAW TO MAKE AN IN-CROP APPLICATION OF ANY DICAMBA HERBICIDE."

Off-label dicamba use exploded. By July 2016, 115 complaints of off-target "dicamba drift" had been filed in Missouri's Bootheel alone. Nevertheless, when the USDA deregulated Monsanto's dicamba-tolerant soybean seed that year, Monsanto began to sell it. The EPA later approved Monsanto's lower-volatility dicamba herbicide in November 2016. BASF's lower-volatility dicamba herbicide was approved in 2017.

Bader Farms, Inc. sued Monsanto and BASF for negligent design and failure to warn, alleging its peach orchards were damaged by dicamba drift in 2015-2019. The jury awarded $15 million in compensatory damages, and $250 million in punitive damages based on Monsanto's acts in 2015-2016. Monsanto and BASF moved for a new trial, remittitur, and judgment as a matter of law. The district court denied the motions for new trial and judgment as a matter of law but reduced punitive damages to $60 million. The district court's judgment also held Monsanto and BASF jointly and severally liable for the punitive damages, even though its instruction on punitive damages only discussed Monsanto.

Defendants appeal, arguing that Bader failed to prove causation, the measure of actual damages is the value of the land rather than lost profits, Bader's lost

profits estimate was speculative, and the punitive damages award was unwarranted under Missouri law and excessive under the United States Constitution. BASF adds that it did not participate in a joint venture or conspiracy with Monsanto, and that punitive damages should have been separately assessed. Having jurisdiction under 28 U.S.C. § 1291, this court affirms in part, reverses in part, and remands with instructions to hold a new trial only on punitive damages.

## I.

The jury was instructed to return a verdict for Bader if it found that the Defendants' failure to "(i) design a safe dicamba-tolerant system or (ii) adequately warn of the risks of off-target movement . . . . directly caused or directly contributed to cause damage" to Bader.

To establish causation under Missouri law, the defendant's conduct must be both the cause in fact and the proximate cause of the plaintiff's injury. *See* ***Simonian v. Gevers Heating & Air Condit'g, Inc.***, 957 S.W.2d 472, 474 (Mo. App. 1997). Monsanto and BASF claim Bader failed to prove causation. They argue (a) no cause in fact because Bader cannot identify whose dicamba product harmed its trees, and (b) no proximate cause because third-party misuse of dicamba was an intervening cause.

## A.

Monsanto and BASF's cause in fact argument relies on the Missouri Supreme Court's decisions in *Zafft* and *Benjamin Moore*.

The plaintiffs in *Zafft* sued all 13 manufacturers of a medication taken to prevent miscarriage, claiming that their cancer (or pre-cancer) resulted from *in utero* exposure to the medication. ***Zafft v. Eli Lilly & Co.***, 676 S.W.2d 241, 243 (Mo. banc 1984). The plaintiffs could not identify whose product their mothers took. *Id.* The Missouri Supreme Court dismissed the suit: "Missouri tort law . . .

requires that [plaintiffs] establish a causal relationship between the defendants and the injury-producing agent as a precondition to maintenance of their causes of action." *Id.* at 247 (alteration added).

In *Benjamin Moore*, a city tried to recover abatement costs from nine manufacturers of lead paint. *City of St. Louis v. Benjamin Moore & Co.*, 226 S.W.3d 110, 113 (Mo. banc 2007). As in *Zafft*, the city could not show whose lead paint was used in the abated residences: "Absent product identification evidence, the city simply cannot prove actual causation." *Id.* at 115-16.

This case is unlike *Zafft* and *Benjamin Moore*. True, Bader cannot identify whose dicamba product affected its peach trees. But the dicamba itself is not the "injury-producing agent" here. The jury believed that Bader would not have been injured but for dicamba-tolerant *seed* sold before farmers could get low-volatility dicamba. Bader's theory of actual causation is that, but for seed that could withstand dicamba herbicide, neighboring farmers would not have sprayed volatile dicamba during growing season. Bader identified whose seed product injured its peach trees: Monsanto's Xtend seed—the only product of its kind on the market. Only if several companies had sold dicamba-tolerant seed products, and if Bader could not identify whose seed product was used by neighboring farmers, would this case resemble *Zafft* and *Benjamin Moore*.

B.

Monsanto and BASF argue that, by using dicamba herbicides illegally and contrary to express warnings, third-party farmers broke the chain of proximate causation.

Proximate cause "includes a sprinkling of foreseeability," but "Missouri, like many other states, has not applied a pure foreseeability test." *Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852, 865 (Mo. banc 1993). In addition to foreseeability, proximate cause analysis considers intervening causes: "When two

or more persons commit successive acts of negligence, the first person's negligence is not the proximate cause of the injury when there is an 'efficient, intervening cause.'" *Brown v. Davis*, 813 F.3d 1130, 1138 (8th Cir. 2016), *quoting Krause v. U.S. Truck Co.*, 787 S.W.2d 708, 710 (Mo. banc 1990). *See also Consol. Rail Corp. v. Gottshall*, 512 U.S. 532, 553 (1994) ("If one takes a broad enough view, *all* consequences of a negligent act, no matter how removed in time or space, may be foreseen."). Even if third-party acts are foreseeable, they may constitute an intervening cause. *See Callahan*, 863 S.W.2d at 865 (holding that "intervening causes . . . may cut off liability"); *Finocchio v. Mahler*, 37 S.W.3d 300, 303 (Mo. App. 2000) (noting that while "[m]any opinions place great emphasis on foreseeability . . . in determining proximate cause," "courts show great reluctance to hold a defendant liable if the chain of causation includes a series of events, subsequent to the initial act or omission, over which the defendant has absolutely no control").

As the district court ruled, the injury here was "foreseeable and in fact foreseen." A slideshow during Monsanto's launch-decision meeting identified "off-label applications of dicamba" as a "risk." To address that risk, Monsanto implemented a "robust communication plan." Missouri courts have rejected the argument by Defendants (and amici) that "it is never objectively foreseeable that a third party will use a product unlawfully or in a way prohibited by the manufacturer." *See Finocchio*, 37 S.W.3d at 303 ("[C]riminal conduct can hardly be said to be unforeseeable in this day and age . . . ."); *Johnson v. Medtronic, Inc.*, 365 S.W.3d 226, 237 (Mo. App. 2012) ("[T]he fact that a particular use of a product is contrary to the manufacturer's instructions does not, *per se*, establish that the use could not be anticipated."), *citing Chronister v. Bryco Arms*, 125 F.3d 624, 627 (8th Cir. 1997). *Cf. Moore v. Ford Motor Co.*, 332 S.W.3d 749, 762 (Mo. banc 2011) (Missouri law "presum[es] that a warning will be heeded" for purposes of "aid[ing] plaintiffs in proving . . . that a warning would have altered the behavior of the individuals involved in the accident" (alterations added)).

The closer question is whether third-party farmers' use of dicamba during growing season—contrary to Monsanto's warnings and the law—is an intervening cause. Monsanto and BASF emphasize *Ashley County v. Pfizer, Inc.*, 552 F.3d 659 (8th Cir. 2009). The plaintiffs there, Arkansas counties seeking costs from the methamphetamine epidemic, sued manufacturers and distributors of over-the-counter cold and allergy medications. **Ashley Cty.**, 552 F.3d at 663-64. This court held that the counties established cause in fact: "but for the Defendants' sale of cold medicine containing pseudoephedrine, the cooks could not have made methamphetamine in such large quantities, and the Counties would not have needed to provide additional government services to deal with the methamphetamine-related problems." **Id.** at 668. As for proximate cause, the manufacturers did not argue that meth production was an unforeseeable consequence of the sale of cold medicine; in fact, they conceded they sold cold medicine "*with the knowledge* that methamphetamine cooks purchase the cold medicine . . . from the retailers and use it to manufacture methamphetamine." **Id.** at 667 (emphasis added). Nevertheless, this court held, as a matter of Arkansas law, that the counties could not establish proximate cause because "the criminal actions of the methamphetamine cooks and those further down the illegal line" were intervening causes that broke the causal chain. **Id.** at 670-71, *citing* **City of Philadelphia v. Beretta U.S.A. Corp.**, 277 F.3d 415 (3d Cir. 2002) (gun manufacturers not liable for third parties' criminal use of handguns).

In Missouri, the question of proximate cause is for the jury unless the evidence reveals an intervening cause that "eclipses the defendant's role in the plaintiff's injury." **Coin Acceptors, Inc. v. Haverstock, Garrett & Roberts LLP**, 405 S.W.3d 19, 24 (Mo. App. 2013). *See also* **Seeley v. Hutchison**, 315 S.W.2d 821, 825-26 (Mo. 1958) (defining intervening cause as "a new and independent force which so interrupts the chain of events as to become the responsible, direct, proximate and immediate cause of the injury").

This court concludes that the spraying of dicamba by third-party farmers did not "so interrupt the chain of events" that the question of proximate cause was not

for the jury. *Ashley County* is different. First, the third-party meth cooks there were "totally independent" from the defendant pharmaceutical companies. *Ashley Cty.*, 552 F.3d at 670. In contrast, Monsanto had direct relationships with the third-party farmers by growers' licenses and technology-use terms. Monsanto therefore exercised some degree of control over their acts. Second, in *Ashley County*, consumers could receive the primary benefit of the product (cold medicine) without misusing it. Here, while Monsanto and BASF stress that the Xtend seed had other benefits (such as superior germplasm), its primary benefit was tolerance to dicamba. Consumers could not receive that benefit without misusing dicamba.

While a reasonable jury could have found intervening cause, the district court correctly declined to find it as a matter of law. *See Gathright v. Pendegraft*, 433 S.W.2d 299, 308 (Mo. 1968) ("We cannot say as a matter of law that a negligent tampering with the pipe, or a negligent attempt by some third person to do an act which was the duty of Mr. Vaughn to perform and which he negligently did not perform, was the efficient intervening cause and not an act of concurring negligence. Defendant Vaughn was not entitled to a directed verdict on the basis of intervening cause.").

Monsanto and BASF argue that, at a minimum, the district court should have instructed the jury on intervening cause. Monsanto stresses that the Missouri Supreme Court ruled, "A defendant may submit the issue of an intervening cause by a converse of the submission of proximate cause in plaintiff's instruction." *Id.* That court likened intervening cause to sole cause, which was not submissible as an instruction but, at the time, could be raised in an affirmative converse. *Id.*, *citing* **Mo. Approved Jury Instr. (Civil) 1.03**.

However, the Missouri Supreme Court has since criticized affirmative converses, especially ones addressing sole cause:

[I]t is apparent that the affirmative converse instruction is not favored for a number of reasons. Such instruction, like the true converse, is an accessory and unnecessary to the instruction package. An affirmative converse instruction tends to resemble a prohibited "sole cause" instruction. The affirmative converse instruction is often merely a resubmission of the issues found in the verdict director. It requires evidentiary support to justify its submission. In addition, it has the propensity to violate the general premise of the approved instruction format by including unnecessary evidentiary details instead of ultimate issues. These potential problems have led some experts to squarely advise, "Do not use the affirmative converse instruction." . . . . [T]he judicial landscape is littered with reversals and retrials in cases where affirmative converse instructions were given.

*Hiers v. Lemley*, 834 S.W.2d 729, 735-36 (Mo. banc 1992) (citations omitted), *discussing* **Mo. Approved Jury Instr. (Civil) 33.05(1)**.

True, federal courts "are not required to give the precise instruction set out in an MAI." ***Hrzenak v. White-Westinghouse Appliance Co.***, 682 F.2d 714, 720 (8th Cir. 1982). But Defendants cite no cases finding reversible error where a district gave the precise MAI. On the other hand, three years after *Hiers*, this court held that a district court committed reversible error by giving an affirmative converse on intervening cause because it "forced [plaintiffs] to attempt to prove . . . sole cause." ***Bening v. Muegler***, 67 F.3d 691, 697 (8th Cir. 1995), *applying* ***Hiers***, 834 S.W.2d at 736.

The district court properly refused to find intervening cause as a matter of law or give an affirmative converse on that issue.

II.

Monsanto and BASF argue that the compensatory damages were based on the wrong legal standard and lacked evidentiary support. They cite several Missouri appellate decisions measuring damage to fruit trees by "the difference in the value of the land before and after the destruction of the trees." ***Cooley v.***

*Kansas City, P. & G.R. Co.*, 51 S.W. 101, 104 (Mo. 1899).  *See also Matthews v. Missouri Pac. Ry. Co.*, 44 S.W. 802, 807 (Mo. 1897) (the "diminution of the market value of the property . . . rule has been applied as affording the measure of damages when . . . fruit–bearing trees have been destroyed"); *Doty v. Quincy, O. & K.C.R. Co.*, 116 S.W. 1126, 1128 (Mo. App. 1909) ("As bearing fruit trees, their chief value depended on their attachment to the land.  Recoverable damages for the injury to them consists alone of the effect such injury had on the market value of the land[.]"); *Steckman v. Quincy, O. & K.C.R. Co.*, 165 S.W. 1122, 1124 (Mo. App. 1914) (value of the land rule used for damaged fruit trees because their replacement "is tedious and a thing of uncertainty, both as to cost and result"); *Butcher v. St. Louis-San Francisco Ry. Co.*, 39 S.W.2d 1066, 1069 (Mo. App. 1931) ("It is well settled that the measure of damages in a case of this kind [damage to orchard trees] is the difference between the market value of the land immediately before and immediately after the fire.") (alteration added); *Kelso v. C. B. K. Agronomics, Inc.*, 510 S.W.2d 709, 725 (Mo. App. 1974) (measuring compensatory damages by the "fair market value of the plaintiffs' farm property before it was damaged and its fair market value after it was damaged" where flood permanently damaged pecan trees), *applying* **Mo. Approved Jury Instr. (Civil) 4.02**.

However, in *Cooley*, the Missouri Supreme Court held that the land-value rule does not apply if the owner of the trees is not the owner of the land:

> Doubtless, the measure of damages of the owner of the land in such case is the difference in the value of the land before and after the destruction of the trees.  But no such rule can apply to a case like this, where the ownership of the land is distinct from that of the trees.  To apply the rule upon which the defendant insists would be to allow the plaintiff to recover for an injury to the value of the land which is the property of the defendant.  This is, of course, preposterous.

*Cooley*, 51 S.W. at 104.

The *Cooley* exception applies here. Bader Farms, Inc. owned the peach trees, but not the land. Bill Bader testified—and Monsanto and BASF acknowledge—that he owned all the orchard land individually (other than 117 acres which were leased from a local grower until 2018), and that no peaches were grown on land owned by Bader Farms, Inc. Before trial, Bill Bader voluntarily dismissed his personal claims against Monsanto and BASF with prejudice. In Missouri, a corporation is "a separate legal entity, separate and distinct from its stockholders, officers, and directors." *Bick v. Legacy Bldg. Maint. Co. LLC*, 626 S.W.3d 700, 705 (Mo. App. 2021). *See also Laredo Ridge Wind, LLC v. Nebraska Pub. Power Dist.*, 11 F.4th 645, 651 (8th Cir. 2021) ("A basic tenet of American corporate law is that the corporation and its shareholders are distinct entities."), *quoting Dole Food Co. v. Patrickson*, 538 U.S. 468, 474 (2003).

The district court properly instructed the jury to measure compensatory damages by lost profits rather than land value.

Monsanto and BASF also argue that Bader's lost-profits estimate was impermissibly speculative. "[C]urrent Missouri cases . . . have maintained that the amount of lost-profit damages cannot rest upon mere speculation." *Cole v. Homier Distrib. Co.*, 599 F.3d 856, 866 (8th Cir. 2010), *citing Gateway Foam Insulators, Inc. v. Jokerst Paving & Contracting, Inc.*, 279 S.W.3d 179, 185-86 (Mo. banc 2009); *Wandersee v. BP Prods. N. Am., Inc.*, 263 S.W.3d 623, 633-34 (Mo. banc 2008); *Ameristar Jet Charter, Inc. v. Dodson Int'l Parts, Inc.*, 155 S.W.3d 50, 54 (Mo. banc 2005). *See also Tipton v. Mill Creek Gravel, Inc.*, 373 F.3d 913, 919 n.6 (8th Cir. 2004) ("Missouri courts have consistently rejected projections when they are based upon assumptions or hopeful expectations."). However, lost profits "often defy exactitude" and "'an adequate basis for estimating lost profits with reasonable certainty' is sufficient." *Cole*, 599 F.3d at 866, *quoting Wandersee*, 263 S.W.3d at 633. A plaintiff provides an adequate basis for lost profits by "provid[ing] evidence of the income and expenses of the business for a reasonable

time before the interruption caused by defendant's actions." ***Wandersee***, 263 S.W.3d at 633 (alteration added).

The lost-profits damages awarded to Bader did not rest upon mere speculation. The orchard had been productive for decades, and Bader provided financial statements showing that peach revenues averaged $2,285,354 from 2011-2014. *Cf.* ***Thoroughbred Ford, Inc. v. Ford Motor Co.***, 908 S.W.2d 719, 735-36 (Mo. App. 1995) (lost profits of a "non-existent [car] dealership" were too speculative). Bader's expert—an agricultural economist—calculated about $20.9 million in actual damages based on, among other factors, acre maturity, tree lifespan, historical yield, the interest rate on Bader's farm operating loans, the time value of money, and "university budgets" projecting maintenance costs. *See* ***Gateway Foam***, 279 S.W.3d at 186 ("Defendant contends that Plaintiff presented mere speculation to support its claim for lost profits, but the record does not support this argument. Plaintiff's accountant presented lengthy testimony about her calculations for its lost profits."). *Cf.* ***Racicky v. Farmland Indus., Inc.***, 328 F.3d 389, 398 (8th Cir. 2003) ("No independent experts testified to the Racickys' lost profits. No business records supporting lost profits were offered. Without financial data establishing profitability, the lost profits award cannot stand.") (applying Nebraska law).

Monsanto and BASF cite other evidence, including tax returns and insurance claims, indicating that Bader's profits projection was unrealistically high. But it is the jury's task to weigh differing testimony; it found the expert's calculation reliable and reasonably certain. *See* ***Gateway Foam***, 279 S.W.3d at 187 ("It was the trial court's task to weigh the differing testimony offered by each party's accountant, and it deemed the testimony of Plaintiff's accountant reliable and found her testimony provided an adequate basis for estimating the lost profits with reasonable certainty."); ***Wandersee***, 263 S.W.3d at 634 ("The jury was free to accept ACT's factual theory and reject BP's."). Considering the evidence most favorably to the jury's determination, there was an adequate basis for the lost profits award. *See* ***Gateway Foam***, 279 S.W.3d at 187.

## III.

The jury found Monsanto and BASF jointly and severally liable for actual damages as joint venturers and co-conspirators. After trial, BASF renewed its motion for judgment as a matter of law challenging Bader's joint-venture and conspiracy claims. The district court denied the motion. BASF appeals, arguing both claims fail as a matter of Missouri law. "We review de novo the denial of a motion for judgment as a matter of law, viewing the evidence and reasonable inferences in the light most favorable to the non-moving party." *Hople v. Wal-Mart Stores*, 219 F.3d 823, 824 (8th Cir. 2000). "[I]t is improper to overturn a jury verdict unless, after giving the nonmoving party the benefit of all reasonable inferences and resolving all conflicts in the evidence in the nonmoving party's favor, there still exists *a complete absence of probative facts* to support the conclusion reached so that no reasonable juror could have found for the nonmoving party." *Hunt v. Nebraska Pub. Power Dist.*, 282 F.3d 1021, 1029 (8th Cir. 2002) (quotation marks omitted).

## A.

In Missouri, the burden is generally on the plaintiff to prove a joint venture by a preponderance of the evidence. *TooBaRoo, LLC v. W. Robidoux, Inc.*, 614 S.W.3d 29, 42-43 (Mo. App. 2020). The elements of a joint venture are: "(1) an agreement, express or implied, among the members of the group; (2) a common purpose to be carried out by the group; (3) a community of pecuniary interest in that purpose, among the members; and (4) an equal right to a voice in the direction of the enterprise, which gives an equal right of control." *State ex rel. Henley v. Bickel*, 285 S.W.3d 327, 331-32 (Mo. banc 2009), *citing* **Restatement (Second) of Torts § 491** (1965). Viewing the evidence and reasonable inferences most favorably to Bader, the first three elements of a joint venture are established: (1) 2010's Umbrella Agreement, 2011's Dicamba Tolerant System Agreement (DTSA) and 2014's Amended and Restated Dicamba Tolerant System Agreement

(ARDTSA) were express agreements;[1] (2) by them, Monsanto and BASF sought to accomplish the common purpose of developing dicamba-tolerant seed; (3) under the Agreements, Monsanto owned the seed, but BASF received "value share payments" for every acre with Xtend seed—a community of pecuniary interest. The issue is whether BASF had equal control over the direction of the enterprise.

The district court relied on the fact that agreements between Monsanto and BASF created an Alliance Management Team with equal representation and alternating chairs. Through the AMT, Monsanto and BASF worked together to develop dicamba-tolerant seed by conducting field trials and research studies, registering herbicides, recommending labels, forecasting seed volume, planning communications, and coordinating a commercial launch strategy. The district court concluded that "the AMT was structured to provide the parties with joint control over the project" and that Bader raised a question of fact about equal control.

However, there is no question that Monsanto maintained full control over the critical aspects of the project. As the district court found, "To be sure, the ARDTSA reserved to Monsanto alone the decision of whether, when, and how to commercialize DT seed, and Monsanto stipulated that BASF had no involvement

---

[1] While all three Agreements between Monsanto and BASF disclaimed the existence of a joint venture, "[w]hether a joint enterprise has been created or not may be determined from the apparent purposes and the acts and conduct of the parties who join in the undertaking" which "may speak above the expressed declarations of the parties to the contrary." ***Denny v. Guyton***, 40 S.W.2d 562, 583 (Mo. banc 1931). *See also **Jeff-Cole Quarries, Inc. v. Bell***, 454 S.W.2d 5, 16 (Mo. 1970) ("There certainly was no evidence of an express agreement to create a joint venture; the question here is whether the evidence shows, by facts and circumstances, that one was in fact created.").

in the decision."[2]    Before trial, Monsanto filed a Stipulation Regarding Commercialization of Dicamba Tolerant Cotton and Soybean Seed:

> Monsanto Company ("Monsanto"), through its undersigned counsel, hereby stipulates as follows:
>
> 1. Effective March 8, 2011, BASF Corporation and Monsanto executed the Dicamba Tolerant System Agreement (hereinafter "DTSA").
>
> 2. Section 3.1 of the DTSA states as follows:
>
>> DT Seed Product Commercialization.  Monsanto shall, in its sole discretion and at its sole expense, determine when and how to commercialize any DT Seed Product in each country in the Territory.  If Monsanto decides not to Commercialize, or to delay Commercialization of, any given DT Seed Product in a given country, it shall promptly notify BASF thereof in accordance with Section 3.2.
>
> 3. Prior to the 2015 growing season, Monsanto exercised its sole discretion under the DTSA and made the decision to commercialize Dicamba Tolerant Cotton Seed ("DT Cotton Seed").

---

[2]    The DTSA says: "'Commercialize' means, with respect to any DT System Crop Protection Product, DT Crop or DT Seed Product, (i) to make, use, recommend, promote, offer for sale, sell, distribute, import, or export, (ii) to permit any Distributor to recommend, promote, offer for sale, sell, distribute, import or export, and (iii) to permit any grower to use, in each case in accordance with the terms of this Agreement and the Pesticide Registration, Crop Registration or license for or label on such product, as applicable.  For the avoidance of doubt, in the case of DT Seed Products, Commercialize includes the licensing of the Dicamba Trait therein by any member of the Monsanto Group." **Dicamba Tolerant System Agreement § 1.25** (2011).  The ARDTSA contains a nearly identical definition. **Amended and Restated Dicamba Tolerant System Agreement § 1.33** (2014) (substituting the words "any product, crop or seed" for "any DT System Crop Protection Product, DT Crop or DT Seed Product").

4. Prior to the 2016 growing season, Monsanto exercised its sole discretion under the DTSA and made the decision to commercialize Dicamba Tolerant Soybean Seed ("DT Soybean Seed").

5. BASF Company was not involved in, and had no role in, Monsanto's decision to commercialize DT Cotton Seed prior to the 2015 growing season; and DT Soybean Seed prior the 2016 growing season.

Relying on this stipulation, BASF moved to exclude "evidence suggesting that BASF Corporation was involved in Monsanto's decision to release Xtend seeds in 2015 and 2016." Bader admitted having no "evidence that any BASF Corp. employee had a vote in the decision to release Xtend seeds." At trial, BASF's counsel read Monsanto's stipulation to the jury—without objection. *Cf. Consol. Grain & Barge Co. v. Archway Fleeting & Harbor Serv., Inc.*, 712 F.2d 1287, 1289 (8th Cir. 1983) ("It is well settled that stipulations of fact fairly entered into are controlling and conclusive and courts are bound to enforce them."); *Stern v. Stern*, 639 F.3d 449, 453 (8th Cir. 2011) (same).

On appeal, Bader acknowledges that "Monsanto controlled the release of the Xtend system" but argues that, through the DTSA, "[t]he parties jointly delegated responsibility for the seed launch to Monsanto." This argument overlooks that BASF relinquished its rights to dicamba-tolerant seed technology by a settlement agreement in 2007, years before the DTSA was executed. Control over the commercialization of dicamba-tolerant seed rested solely with Monsanto before its Agreements with BASF. Through them, Monsanto continued its sole control. BASF could not delegate rights it did not possess.

"[A]ssigned roles in the total project" are "usual in joint ventures." *Johnson v. Pac. Intermountain Exp. Co.*, 662 S.W.2d 237, 242 (Mo. banc 1983). However, there "must be some evidence of the parties participating and having control over the enterprise," whether that be "joint or several control." *Thompson v. Tuggle*, 183 S.W.3d 611, 617 (Mo. App. 2006) (quotation omitted). While the Agreements assign BASF a role in the development of Xtend seed, they reserve to

-17-

Monsanto full control over its commercialization. Because BASF had no control over when, how, or even whether to release dicamba-tolerant seed, BASF did not have equal control over the direction of the enterprise.

BASF also lacked control over farmers who planted Xtend seed. Bader argues its injury was exacerbated by a failure to investigate and punish off-label dicamba use. But, citing the record, Bader acknowledges that "Monsanto controlled the release of the Xtend system and controls Xtend-seed purchasers through its TUGs [technology use terms]. Monsanto could have stopped illegal spraying by rescinding offenders' licenses but refused." It is undisputed that BASF did not have control over either of the decisions that injured Bader.

Because the record does not support a finding that BASF "had any voice, much less an equal voice" over the critical aspects of the enterprise, Bader's joint-venture claim fails as a matter of law. *Hatch v. V.P. Fair Found., Inc.*, 990 S.W.2d 126, 139 (Mo. App. 1999). *See Jeff-Cole Quarries, Inc. v. Bell*, 454 S.W.2d 5, 16 (Mo. 1970) (joint-venture claim against a general contractor and landowners failed as a matter of law because "there [was] no evidence that [the landowners] participated in or controlled the construction" (alterations added)); *Howard v. Winebrenner*, 499 S.W.2d 389, 396 (Mo. 1973) (truck driver's joint-venture claim against a transportation company failed as a matter of law because "there was no mutual right to control between plaintiff and defendant. Plaintiff only drove defendant's tractor; defendant had the right to remove and discharge him at any time."); *Johnson*, 662 S.W.2d at 242 (joint-venture claim against a truck driver and a freight broker succeeded because evidence showed that the freight broker "had control over, or the right to control, [the truck driver] as he headed west with the truck" (alteration added)); *Henley*, 285 S.W.3d at 332 (joint-venture claim against a husband and wife failed as a matter of law because plaintiff failed to plead facts "showing . . . an actual ability [of the passenger wife] to control the driver [husband]" (alterations added)); *Dillard v. Rowland*, 520 S.W.2d 81, 91 (Mo. App. 1974) (joint-venture claim against a hospital and a university failed as a matter of law because "although facilities [were] shared for

-18-

mutual benefit, no portion of the agreement between the two institutions [gave] either the right to control any of the operations of the other . . . . an important and necessary element, the right to control, was not present" (alterations added)); *Inauen Packaging Equip. Corp. v. Integrated Indus. Servs., Inc.*, 970 S.W.2d 360, 371 (Mo. App. 1998) (manufacturer's joint-venture claim against a marketing company failed as a matter of law because "[w]hile [the owner of the marketing company] may have been successful in pursuing some of the changes he wanted to see made at [the manufacturer], it is clear [from] the record that [the marketing company]'s voice was not 'equal' to [the manufacturer]'s . . . . [the manufacturer] failed to prove [its] relationship with the [the marketing company] was anything more than people who had entered into a contract"); *Ritter v. BJC Barnes Jewish Christian Health Sys.*, 987 S.W.2d 377, 388 (Mo. App. 1999) (joint-venture claim against two hospitals failed as a matter of law because while one hospital had "control over [the other hospital's] budget matters and the board of directors," it did not "control the way in which [the other hospital] delivers health care"); *Hatch*, 990 S.W.2d at 139 (joint-venture claim against a bungee jumping company and a fair organizer failed as a matter of law because "evidence that [the fair organizer] chose the site, permitted [the bungee jumping company] to use its logo, took tickets and payment, controlled the crowd, and lined up prospective jumpers does not establish that [the fair organizer] had any voice, much less an equal voice, in the details of the operation of the bungee jump" (alterations added)); *Thompson*, 183 S.W.3d at 617 (joint-venture claim against tenants and their landlord failed as a matter of law because the landlord "had no control over the property . . . . there was no joint or several control required to form a joint venture"). *Cf. Firestone v. VanHolt*, 186 S.W.3d 319, 326 (Mo. App. 2005) (joint-venture claim against a roofing company and a home-improvement company was for the jury because, since only the home-improvement company had the necessary permit and liability insurance to do the construction job, the home-improvement company may have had "the requisite control necessary to find a joint venture"); *TooBaRoo*, 614 S.W.3d at 40-41 (software company's joint-venture claim against a printing company succeeded where the owner of the software company was also on the

printing company's board of directors, which included only him and his immediate family members).

B.

"Civil conspiracy is an agreement or understanding between two or more parties to do an unlawful act or use unlawful means to do a lawful act." ***Park Ridge Assocs. v. UMB Bank***, 613 S.W.3d 456, 463 (Mo. App. 2020). Civil conspiracy is proven where the plaintiff establishes: "(1) two or more persons (2) an unlawful objective, (3) a meeting of the minds, (4) an act in furtherance of the conspiracy, and (5) damages." ***Id.*** at 463-64. "Plaintiffs need not plead or prove the conspirators intended to harm them if they can show harm resulted." ***Id.***at 464.

Probative facts support the jury's conclusion that Monsanto and BASF participated in a conspiracy. Resolving conflicts in the evidence in Bader's favor, Monsanto and BASF agreed to use unlawful means—knowingly enabling widespread off-label use of dicamba during growing season—to increase sales of Xtend seed. Under the terms of the Umbrella Agreement, DTSA, and ARDTSA, both companies took acts in furtherance of this unlawful objective. They agreed to share access to proprietary testing and data for regulatory approval, share materials to enable testing and development, share in the costs of dicamba residue testing, and make capital expenditures to fulfill their respective obligations under the agreements. Monsanto also pursued a "protection from your neighbor" marketing campaign while BASF identified "defensive planting" as a "Market Opportunity" and "ramped up availability of its [higher-volatility dicamba] product after Monsanto announced the launch of Xtend seeds in 2015."

As a member of the civil conspiracy, BASF is jointly and severally liable for Bader's actual damages. ***W. Blue Print Co., LLC v. Roberts***, 367 S.W.3d 7, 22 (Mo. banc 2012) ("[C]ivil conspiracy . . . . acts to hold the conspirators jointly and severally liable for the underlying act."), *citing* ***8000 Maryland, LLC v. Huntleigh Fin. Servs. Inc.***, 292 S.W.3d 439, 451 (Mo. App. 2009). *See also* ***Taylor v.***

-20-

*Compere*, 230 S.W.3d 606, 611 (Mo. App. 2007) ("Establishing a conspiracy will make all defendants jointly and severally liable for actual damages."), *quoting* *Moore v. Shelton*, 694 S.W.2d 500, 501 (Mo. App. 1985).

IV.

The defendants challenge the punitive damages award in three ways. First, Monsanto and BASF argue that punitive damages were not submissible under Missouri law. Second, BASF argues that, after instructing the jury to assess punitive damages against Monsanto only, the district court erred in holding Monsanto and BASF jointly and severally liable for punitive damages. Third, Monsanto and BASF believe that the amount awarded was unconstitutionally excessive under the Due Process Clause of the Fourteenth Amendment. This court reviews "for abuse of discretion the district court's conclusion that the jury's award of punitive damages comported with state law." *Hallmark Cards, Inc. v. Monitor Clipper Partners, LLC*, 758 F.3d 1051, 1060 (8th Cir. 2014). The award's constitutionality is reviewed de novo. *Id.*

A.

According to Monsanto and BASF, the district court abused its discretion by submitting punitive damages to the jury.

In Missouri, punitive damages are awarded to deter and retribute. *All Star Awards & Ad Specialties, Inc. v. HALO Branded Sols., Inc.*, 642 S.W.3d 281, 296 (Mo. banc 2022). They are warranted only with "clear and convincing evidence" that the defendant "acted with either an evil motive or a reckless indifference to the plaintiff's rights." *May v. Nationstar Mortg., LLC*, 852 F.3d 806, 814 (8th Cir. 2017), *citing* *Burnett v. Griffith*, 769 S.W.2d 780, 789 (Mo. banc 1989). Factors against submission of punitive damages include (1) the defendant did not knowingly violate a statute, regulation, or clear industry standard designed to prevent the type of injury that occurred; (2) prior similar occurrences

-21-

known to the defendant have been infrequent; and (3) the injurious event was unlikely to have occurred absent negligence on the part of someone other than the defendant. *Lopez v. Three Rivers Elec. Co-op., Inc.*, 26 S.W.3d 151, 160 (Mo. banc 2000).

Monsanto and BASF argue that the *Lopez* factors weighed against the submission of punitive damages. First, they stress that "it is undisputed that Monsanto did not sell Xtend seeds until it received regulatory approval from USDA." However, as the district court said, evidence showed that "Monsanto consciously blocked testing for volatility to avoid evidence of off-target movement that could interfere with regulatory approval," implemented a "moratorium on testing . . . to prevent off-site movement of dicamba while the EPA reviewed their data submissions," "denied academics' requests to perform volatility testing," and "blocked its own Technical Development employees from spraying dicamba over Xtend seed to avoid bad results." Under its agreements with Monsanto, BASF accessed, contributed to, and funded testing of the Xtend system. The best evidence: in February 2015, BASF "advised" its "biology and tech service" of Monsanto's "concerns that [field testing] results could negatively impact [the] EPA's registration decision."

Second, Monsanto and BASF emphasize that, when Monsanto began selling Xtend seed, "prior instances of off-target dicamba injury were minimal." But of course they were—before dicamba-tolerant seed, farmers had no reason to spray dicamba during growing season. As the district court said, Monsanto "launched the Xtend seeds without a corresponding low-volatility herbicide in 2015 despite knowing that farmers intended to spray dicamba off-label," and so was not caught off guard by a lack of prior instances. The district court continued, "Despite knowing that farmers did use old-dicamba over-the-top in 2015, Monsanto continued to sell Xtend seeds in 2016." BASF officials also knew that off-label dicamba use was "widespread in cotton [in 2015] and that it will be rampant in 2016."

The third *Lopez* factor is neutral. True, the damage to Bader's peach trees required negligence on the part of third-party farmers. However, "Monsanto chose not to enforce its grower license to prevent off-label dicamba use over Xtend seeds" and "refused to investigate complaints of dicamba damage in the Bootheel in 2015 or 2016." If Monsanto had taken these measures, it would have limited the kind of third-party negligence that caused Bader's injury. BASF also chose to ramp up production of its volatile dicamba product to meet the demand created by Xtend seed.

Bader provided clear and convincing evidence that Monsanto and BASF acted with reckless indifference, and the *Lopez* factors did not prevent submission of punitive damages.

B.

The jury was instructed it could "find that Defendant Monsanto Company is liable for punitive damages" if it "believe[d] the conduct of Defendant Monsanto Company . . . showed complete indifference to or conscious disregard for the safety of others." The instruction did not mention BASF at all. Only Monsanto presented a defense during the trial's punitive damages phase, and the only additional evidence was a stipulation of Monsanto's net worth. The verdict stated, "We, the jury, assess punitive damages against Defendant Monsanto Company at $250,000,000.00." After trial, the district court remitted punitive damages to $60 million. It also adopted Bader's proposed judgment that Monsanto and BASF would be jointly and severally liable for the punitive damage award. BASF argues this was error, and that punitive damages should not have been awarded without a jury's individualized assessment of its wrongdoing.

-23-

1.

Under Missouri law, "defendants shall only be severally liable for the percentage of punitive damages for which fault is attributed to such defendant by the trier of fact." **§ 537.067.2, RSMo 2016**. Missouri defendants have a "right to have their conduct considered separately for the purpose of determining whether or not punitive damages should be awarded." *Saunders v. Flippo*, 639 S.W.2d 411, 412 (Mo. App. 1982). *See also* **Desai v. SSM Health Care**, 865 S.W.2d 833, 838 (Mo. App. 1993) ("*Saunders* stands for the proposition that MAI 10.03 must also be used if a claim for punitive damages is offered against multiple defendants."). *See generally* **Mo. Approved Jury Instr. (Civil) 10.03** (8th ed) ("When submitting against more than one defendant for punitive damages, use an appropriate instruction . . . as a separate paragraph for each such defendant. Use the following sentence as the concluding paragraph of the punitive damage instruction: If punitive damages are assessed against more than one defendant, the amounts assessed against such defendants may be the same or they may be different."); **Mo. Sup. Ct. R. 70.02(b)** ("Whenever Missouri Approved Instructions contains an instruction applicable in a particular case that the appropriate party requests or the court decides to submit, such instruction shall be given to the exclusion of any other instructions on the same subject.").

If Monsanto and BASF had formed a joint venture, a judgment holding BASF jointly and severally liable for punitive damages based on Monsanto's conduct may have been appropriate. *See* **Ballinger v. Gascosage Elec. Co-op.**, 788 S.W.2d 506, 515 (Mo. banc 1990) ("A joint venture is a species of partnership and is governed by the same legal rules."); **Binkley v. Palmer**, 10 S.W.3d 166, 169 (Mo. App. 1999) (same); *Firestone*, 186 S.W.3d at 324 ("A joint venture is a species of partnership."), *citing* **Johnson**, 662 S.W.2d at 241; **Blanks v. Fluor Corp.**, 450 S.W.3d 308, 402 (Mo. App. 2014) ("Missouri recognizes that partners are vicariously liable for punitive damages based on acts of their copartners done in the course of partnership business."); **§ 358.130, RSMo 2016** ("Where, by any wrongful act or omission of any partner acting in the ordinary course of the

business of the partnership or with the authority of his copartners, loss or injury is caused to any person, not being a partner in the partnership, or any penalty is incurred, the partnership is liable therefor to the same extent as the partner so acting or omitting to act."). However, as discussed in part III.A. above, Bader's joint-venture claim fails as a matter of law because BASF did not have equal control over the direction of the enterprise.

Bader's conspiracy claim *is* supported by probative facts, but establishing a conspiracy "does not change the rule" that punitive damages against multiple defendants must be assessed separately. *Moore*, 694 S.W.2d at 501. After a bench trial, the trial court in *Moore* ruled that the defendants had conspired and awarded punitive damages "against all of the defendants . . . in the sum of $10,000." *Id.* On appeal, the defendants argued that the punitive damage award was "improper as the amount of punitive damages should have been specified as to each defendant." *Id.* Plaintiff "counter[ed] that [the joint and several award] was proper because there was a conspiracy." *Id.* (alterations added). The Missouri Court of Appeals reversed:

> Establishing a conspiracy will make all defendants jointly and severally liable for actual damages, but it does not change the rule that punitive damages are to be assessed against each tort-feasor depending, among other factors, upon his degree of culpability. There may be cases where punitive damages should be the same against each defendant. However, as prescribed in that verdict form, ordinarily they should be set forth separately.

*Id.*, *applying* *State ex rel. Hall v. Cook,* 400 S.W.2d 39, 41 (Mo. banc 1966). Because the evidence there "established different degrees of culpability and wealth of defendants . . . the trial court should have separately assessed the punitive damages against each defendant." *Id.* at 501-02. *See also Taylor*, 230 S.W.3d at 611 (reiterating, where a debtor and his accountants conspired to commit fraudulent stock transfers, that "while the principles of joint and several liability and imputation of conduct may apply to an actual damages claim, such principles are not to be applied to a punitive damages claim when the evidence shows

-25-

differing degrees of culpability and/or ability to pay"), *quoting **Brown v. New Plaza Pontiac Co.***, 719 S.W.2d 468, 473 (Mo. App. 1986); ***Heckadon v. CFS Enterprises, Inc.***, 400 S.W.3d 372, 381 n.9 (Mo. App. 2013) (affirming trial court's decision to separately assess punitive damages against co-conspirators "based upon their individual degree of culpability" "even though the actual damage awards [were] merged into a single award") (alteration added), *citing **Taylor***, 230 S.W.3d at 611.  *Accord **BMW of North America, Inc. v. Gore**,* 517 U.S. 559, 575 (1996) ("exemplary damages imposed on a defendant should reflect 'the enormity of his offense'"), *quoting **Day v. Woodworth***, 54 U.S. 363, 371 (1851).

The evidence here "establishe[s] different degrees of culpability" between the co-conspirators.  ***Moore***, 694 S.W.2d at 501-02 (alteration added).  The district court should have instructed the jury to "separately assess" punitive damages against Monsanto and BASF.  ***Id.***

2.

Bader argues that BASF waived its right to separate assessment by failing to (1) object to the instruction's lack of apportionment, (2) object to introduction of Monsanto's net worth, and (3) present argument during the punitive damages phase.  Bader overlooks that months before trial, the district court dismissed Bader's claim against BASF "for joint liability for any punitive damages award" upon BASF's motion.  Then, when Bader proposed the joint and several punitive damages judgment after trial, BASF filed a timely motion to alter the judgment stating the grounds for its objection.  These acts sufficiently preserved BASF's separate assessment argument. *See **United States v. Ali***, 616 F.3d 745, 751-52 (8th Cir. 2010) ("[P]reserving an issue is a matter of making a timely objection to the trial court and clearly stating the grounds for an objection, so that the trial court has an opportunity to prevent or correct the error in the first instance."), *citing **Puckett v. United States***, 556 U.S. 129, 134 (2009) ("If a litigant believes that an error has occurred (to his detriment) during a federal judicial proceeding, he must object in order to preserve the issue.  If he fails to do so in a timely manner, his claim for

-26-

relief from the error is forfeited.  No procedural principle is more familiar to this Court than that a right may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it." (citation and quotation marks omitted)).

This court therefore vacates the punitive damages award and remands the case with instructions to hold a new trial only on the issue of punitive damages. *See Kirk v. Schaeffler Grp. USA, Inc.*, 887 F.3d 376, 390 (8th Cir. 2018) ("A partial new trial on damages is permitted by Rule 59(a)(1) . . . . [W]e have often remanded for retrial of punitive damages only."), *citing* **Fed. R. Civ. P. 59(a)**.  *See also Burnett*, 769 S.W.2d at 790-91 ("[Missouri Supreme Court Rules give] authority to grant a new trial on a single issue of punitive damages if . . . the evidence so justifies . . . . In our judgment the resubmission of the case on punitive damages only is in the interest of both judicial economy and judicial efficiency."); *McCrainey v. Kansas City Missouri Sch. Dist.*, 337 S.W.3d 746, 756 (Mo. App. 2011) ("[W]here there [is] no error in the jury's finding of liability, the plaintiff should not have to risk his verdict where the only remaining issue was with regard to punitive damages." (alterations added)), *citing Burnett*, 769 S.W.2d at 791.

## C.

Monsanto and BASF argue that the $60 million punitive damages award is unconstitutional under the Due Process Clause of the Fourteenth Amendment, which prohibits "grossly excessive" civil punishment.  *See Grabinski v. Blue Springs Ford Sales, Inc.*, 203 F.3d 1024, 1025 (8th Cir. 2000), *citing Gore,* 517 U.S. at 575.  This court need not address whether the amount of vacated punitive damages is unconstitutionally excessive.

\* \* \* \* \* \* \*

-27-

This court reverses in part, vacates the award of punitive damages, and remands with instructions to hold a new trial on the single issue of punitive damages.  In all other respects, the judgment is affirmed.

_____